ROBERT T. BARRETT ET AL. V. JOHN KELLY ET AL.

A grant executed by the alcalde of Austin's colony, the land lying above the Nacogdoches and San Antonio road, is not void for want of power in the officers, although the said road was the northern boundary of Austin's colony; that the land was within the jurisdiction of the officers who issued the grant has been settled in Hancock v. McKinney, 7 Tex., 348; Pyron v. Jackson, 11 Tex., 391; and Martin v. Parker, 26 Tex., 253.

Where the owner of the junior title did not attack the older title for over twenty years, and then the attack was not by record evidence, but by parol, the objection should be considered as stale.

There are three important eras in the jurisprudence of Texas: first, the laws of Mexico, which were in force until the revolution in 1836; second, the

constitution of 1836, and the statutes introduced prior to 1840, together with the Mexican laws not thereby repealed; third, the common law introduced by the act of 20th of January, 1840. (Paschal's Dig., Arts. 804, 978, Notes 396, 418.)

This common-law act enabled aliens to come to Texas with their household goods.

The annexation of Texas to the United States in 1845 removed all objections to a citizen of the United States on account of alienage.

Prior to annexation Texas might have forfeited the lands belonging to alien citizens, but after annexation no such right existed against citizens of the United States. (Paschal's Dig., Art. 43, Notes 153, 159, 237.)

By the common law an alien could not maintain an action to recover real property.

An alien might acquire land, but he held it subject to the will of the government, and upon his death the property reverted to the government.

APPEAL from McLennan. The case was tried before Hon. JOHN GREGG, one of the district judges.

The Galindo eleven-league grant, issued on the 19th March, 1833, upon a concession to Galindo dated 13th July, 1830, was older than the colonist grant to Bowman, under which the plaintiffs claimed, and if the eleven-league grant was valid, the plaintiff had no right to recover. The plaintiff attacked the Galindo grant on the grounds of want of authority in the officers to issue it and want of capacity in the grantees to take and hold the land. It is useless to follow up the altercations in the pleadings or the objections to the evidence. Everything returned to the objections to the Galindo title. There was a judgment for plaintiff, from which he appealed.

*Moore & Shelley*, for the appellants, cited the following authorities: Martin v. Parker, 26 Tex., 257; Hubbard v. Goodwin, 3 Leigh, 211; Atkins v. Kim, 3 Ind. Eq., 207; Orr v. Hodgson, 4 Wheat., 465; Welland's Eq. Jur., 600; Fulton v. Duncan, 18 Tex., 34; Clay v. Holbert, 14 Tex., 191; Ryan v. Jackson, 11 Tex., 361; Johnston v. Smith, 21 Tex., 722.

*F. W. Chandler*, for the appellees.—I. A municipality is

a creature of positive law, and as such must have territorial limits; and a grant made by an alcalde beyond the jurisdiction of the municipality of the alcalde is void; and this grant was so made. (See Land Law in Cal., Oreg., and Texas, vol. 1, p. 574; 2 Tex., 27, 28.)

Courts are bound to know the political subdivision of the country and their precise limits when described in public statutes. (1 Greenl. on Ev., § 6; see Nos. 196, 265, 295, Laws and Decrees of Coahuila and Texas.)

II. The charge of the court below on the question of alienage of the defendant's ancestors, and the invalidity of the grant on that account, was correct in the main; and, if error is found therein, it was error in behalf of appellants. In 1833, if the Barretts, the ancestors of the appellants, were aliens, then they could not take or hold any land in Coahuila and Texas or right thereto, in their own names or in the name of another for them. (1 Tex., 673; 2 Tex., 28.)

III. If the commissioner knew at the time that the land included in the Ignacio Galindo grant was granted for the benefit of the Barretts, and that they were foreigners, although in getting this grant they used the name of William H. Wharton and Jose Ignacio Galindo, still the fraud, when pleaded, proved, and found by the jury, would vitiate the grant. (Mason v. Russel's Heirs, 1 Tex., 730.)

Fraud vitiates every transaction, even the most solemn proceeding of the highest courts of record in the land. (2 Stark. on Ev., 339; 2 Black Com., 286; 3 Cruise's Dig., 47; Story's Confl., 498. "Wherever it occurs it vitiates the transaction tainted by it, both in law and equity." (1 Johns. Chan., 405; 1 Vesey, 120, 281, 289; 1 Tex., 730; 1 Tex., 598; 15 Tex., 180; 2 Baily, 324.)

No man can take advantage of his own fraud, and this court will not hear the children set up the fraud of their ancestors to maintain their inheritance.

There is no difference, as to the effect upon the public or the morality of the act, whether the commissioner knew

the fraud or not. The fraud consisted in the making the grant to foreign grantees. (1 Tex., 730.) Those who claim under a void grant can acquire no right. (7 Pet., 231; 1 Har. Chan., 452, 140, 146; 3 Wilson, 111; 2 Mad. Chan., 409; 1 Johns. Chan., 482; 1 Pet., 517, 542; 5 Coke, 110; 2 Black. Com., 394; Bacon's Abrid., tit. VOID and VOIDABLE, 374; 3 Wend., 411; 2 How., 318; 3 La. Con., 477; B. & S. Dig., 274 Pand. Rom. Civ. Law, 426.)

"Where public utility is concerned, fraud vitiates any transaction which in itself would tend to public mischief." (Public Utility, Rob., 538, Hovenden, 13.)

MORRILL, C. J.—In 1830 one Galindo, a Mexican citizen, received from the proper authorities of Mexico a concession for eleven leagues of land. This concession, in the year 1833, was located on certain tracts of land, and titles issued to one Wharton, who was also a citizen of Mexico, and who became previously the purchaser thereof. On the 13th day of April, 1833, the day of the issuance of the title, Wharton sold the land to James Barrett and W. D. Barrett.

In 1835 there was granted to one Bowman, as a colonist of the Nashville colony, a title to one league of land, being a portion of the eleven leagues granted to Galindo.

On the 22d of May, 1854, suit was instituted by the owners of the Bowman league against the owners of the Galindo grant for that portion of the land covered by both grants.

The reasons assigned by plaintiff why his younger title should prevail over the older title were—

1. That the agents of the government who executed the title to the assigns of Galindo had no authority to issue it, because the land was beyond their limits.

2. That the title was issued for the benefit of aliens.

3. That the purchasers of the land from Wharton were aliens, and at the time the title was issued to Bowman for

the league of land conflicting with the eleven-league grant, the owners of the eleven-league grant were aliens.

There were some other questions raised, but the case must turn on these.

It is admitted that the concession to Galindo was legal and regular, and no valid objection is made to the ownership of this by Wharton.

The first question is, had the authorities who extended the title to Wharton power so to do or jurisdiction over the land in controversy? This is now not an open question. The cases of Hancock v. McKinney, 7 Tex., 384; Ryan v. Jackson, 11 Tex., 391; Martin v. Parker, 26 Tex., 253, all concurring affirmatively upon the same point, it is *res adjudicata.*

The second question will next receive our attention. It will be perceived that the parties kept silent for upwards of thirty years before they attempted to set aside or attack the validity of this older grant, and the testimony relied on either for attack or defense is not of record, but depending upon the recollection and memory of man. Witnesses were introduced to state what they recollected concerning a matter that took place upwards of thirty years previously, and which at the time could be but a mere rumor. We certainly hold our property by very precarious titles if we have to depend not upon the titles themselves, but what some one may recollect concerning them. And for this reason statutes of repose have been introduced in all organized governments, and there are none where the legislatures have been more careful in this respect or given less time to institute suits than in our own state. The longest time allowed in any case is ten years, and a suit founded upon facts which took place previous to twice this allotted time should be called a stale demand and so treated by the courts.

The third and last question relates to the alienage of the defendants.

There are three important eras in the jurisprudence of Texas.

Previous to the 2d of March, 1836, the laws of Mexico, based upon the civil law, were the laws in force. The principles declared in the constitution of 1836, and the statutes of the state from that time to 1840, together with the old Mexican laws, formed the code of laws for that period.

On the 20th of January, 1840, the legislature, in one and the same act, repealed all laws in force prior to the 1st of September, 1836, with some few exceptions therein named, and adopted the common law of England as a rule of decision, so far as it was not inconsistent with the constitution or the acts of congress then in force. This act enabled the citizens of the United States to come to Texas with their household gods. But when the annexation to the United States took place in 1845 we became a part and parcel of the United States, and none of the citizens of the United States were aliens to Texas, and the citizens of Texas would be in their own country from the St. Lawrence to the Gulf of Mexico.

All the laws therefore relative to alienage, so far as the same were of Mexican or Spanish origin, were abolished in 1840. And all cause for invoking the common law of England or the constitutional or statute laws of the state on the same subject, in suits between citizens of Texas and those residing in other parts of the United States, was swept away by the union of the two governments, or rather by the merger of Texas in the United States.

From 1833 to 1840 the defendants were liable to have their lands divested from themselves by due process of law according to the laws of Mexico, and from 1840 to 1845 the State of Texas could, by proper suit and showing that the owners were aliens, dispossess them of the lands in question.

This suit was instituted in 1854, when the defend-

xxxi—31

ants were citizens of the United States, and were not aliens.

There is no allegation that any court or political authority ever adjudicated upon the alienage of defendants while they were such, and there can be as little question that without some process of this kind the rights of the parties to the land were never divested. The Galindo title, it is admitted, was properly mapped, and appears in all respects legal, in the general land office, and is of anterior date to that of plaintiff's, and none of the parties connected with it up to the date of its issuance under any disabilities.

The first and leading case on the question of alienage is The Heirs of Holliman v. Peebles, 1 Tex., 673. That was a suit by alien heirs of an alien ancestor to recover lands which had been granted to the ancestor, but divested from him in his lifetime by the ayuntamiento, and reinvested in the government and reconveyed to Peebles. The learned chief justice, in giving the opinion of the court, showed his extensive knowledge of the civil and Mexican laws, but the judgment of the court was in two lines: " That under the plea of alienage the plaintiffs are disabled from maintaining the action." In the words of the common law, " an alien cannot maintain a suit to recover real property." As the suit was instituted in December, 1840, the common law of England, and not the civil, was the rule of the decision.

In Yates v. Iams, 10 Tex., 174, the party plaintiff represented an alien heir, and the same judgment followed.

In White v. Sabriego, 23 Tex., 244, the plaintiffs were citizens of Mexico, and brought suit to recover land. The court in the opinion said: " The naked question is presented, whether an alien non-resident can maintain in the courts of this state an action of trespass to try title. The plea that the plaintiff is an alien, interposed to a real action, goes in general to defeat the right of action altogether, upon the ground of public policy, which denies the right of an alien to inherit or hold lands."

In all of these cases the plaintiffs were aliens. In the case before the court the defendants are the reputed aliens. The common-law doctrine is well laid down in a New York case: "An alien may purchase land, or take it by devise, but holds it at the will of the government. The government may at any time institute an inquest of office, for the purpose of ascertaining whether he is an alien or not; and, if it be found that he is, the estate or possession of the land is immediately vested in the people of the state, who before had only the right or title. The people cannot enter into the possession of an alien without this judicial proceeding. His entry and possession and holding are lawful, and can be terminated only by regular legal proceedings.

"But when an alien who holds land dies, at common law it instantly, and of necessity, without any inquest of office, escheats and vests in the state, because the freehold cannot be kept in abeyance, and he is incompetent to transmit by hereditary descent. The law, *quæ nihil frustra*, never casts the freehold upon an alien heir who cannot keep it." (Jackson v. Adams, 7 Wend., 368.)

It would thus seem that an alien can defend against any one but the government, and it is very doubtful that any well-considered case can be found to the contrary, based on the common law of England.

We have not deemed it advisable to take up the several rulings of the court, or follow the meanderings of the attorneys in conducting the cause. The very lucid reasoning of this court in Johnston v. Smith, 21 Tex., 724, as also in Bowmer v. Hicks, 22 Tex., 159, by the same distinguished judge, could very properly be taken in part to apply to this case. As both of those cases were reported after the trial of this case in the district court, it is presumed the district judge was not conversant with them. The reversal of the judgment in this case may be couched in almost the identical words of Chief Justice WHEELER, in the last-named case.

REVERSED ACCORDINGLY.