Bascom **GILES**, Commissioner of the General Land Office et al., Appellants,

v.

Russell S. **PONDER** et al., Appellees.

No. 12696.

Court of Civil Appeals of Texas.

San Antonio.

Jan. 19, 1955.

Rehearing Denied Feb. 16, 1955.

John Ben Shepperd, Thomas Black, Austin, for appellant.

Kelso, Locke & King, J. R. Locke, J. R. Locke, Jr., San Antonio, J. W. Timmins,

Martin A. Rowe, Dallas, Wood & Pratt, Corpus Christi, Wm. E. Remy, San Antonio, Weldon Cabiniss, Rockport, for appellees.

POPE, Justice.

Russell S. Ponder commenced this suit under the provisions of Article 5421c, Vernon's Ann.Civ.Stats., claiming a described area as vacant unsurveyed lands. He sued many parties who claim interests in the land concerned, including the Commissioner of the General Land Office of Texas and the Attorney General of Texas. The judgment awarded Ponder a tract of land as vacant land, but held that other described lands were not vacant. The Commissioner of the General Land Office and the Attorney General are the only appellants, and they urge that other lands are also vacant lands.

The controversy is over a portion of low-lying land below a bluff and presents the legal question of whether the civil law rule or the common law rule shall apply to a Republic grant in fixing the shoreline to the property which fronts on Copano Bay, in Aransas County, Texas. Certain steps were commenced to obtain a patent from the Republic of Texas prior to January 20, 1840, when the Republic generally adopted the common law, but the field notes were not returned to the land office and the patent did not issue until after that date. The State insists that the grant had its inception under the civil law, and for that reason the shore of the sea is to the line of the highest tide in winter; but the appellees argue that the grant extended, under the common law, to the line of ordinary high tide. Mayor, etc., of City of Galveston v. Menard, 23 Tex. 349; Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728; De Merit v. Robison, 102 Tex. 358, 116 S.W. 796; Hynes v. Packard, 92 Tex. 44, 45 S.W. 562; Galveston City Surf Bathing Co. v. Heidenheimer, 63 Tex. 559, 562; State v. Balli, Tex.Civ.App., 173 S.W.2d 522, 543; Angell on Tide Waters, 20–27; Farnham, Waters and Water Rights, 228 (1904); 44 Tex.Jur., Water, § 99. The shore line under the civil law is at a higher point than under the common law and, applied to the ground, the difference between the lines is the property here in dispute.

After Texas became a Republic, but before it generally adopted the common law, Henry Smith, a transferee of the William Steele Land Warrant No. 840, dated December 8, 1837, caused John Talley, the Deputy Surveyor for Refugio County, to survey what is described in the field notes as "1280 acres of land" which fronted on the bay. Henry Smith, also a transferee of the Van Benthuysen Land Warrant No. 1188, dated December 20, 1837, caused the same surveyor to survey "640 acres of land" adjoining the other tract. The surveys were made and the field notes prepared with plats attached, and the surveyor, in accord with the law then in effect, made his affidavits that the plat, field notes and the survey were made since the first day of August, 1838. These affidavits were dated and signed by the deputy surveyor on September 23, 1839, and on the same date were certified as correct by the Refugio County Surveyor. The trial court found as a fact, based upon presumptions, that the field notes on the two surveys were not filed in the General Land Office until after January 20, 1840, when the Republic generally adopted the common law. The patents were issued by Marabeau B. Lamar during April of 1841.

John Talley, in making his survey along the shore, ran his line on the upland rather than going below what was a small bluff and onto the low-lying "flats" in dispute. The trial court correctly determined, upon sufficient evidence, that the line was a meander line. The grantee of meandered land owns at least to the shore line, whichever shore may be the correct one. Stover v. Gilbert, 112 Tex. 429, 247 S.W. 841.

The State reasons that the grant took its civil law nature when the property vested, which occurred when it was located and surveyed. The appellees argue that

the grant was not operative until after January 20, 1840, because the field notes were not returned to the General Land Office and the patent did not issue until after 1840. We hold that the common law shore line is the true line, because:

(1) Under the Constitution and Statutes of the Congress of the Republic, grants made by the Republic between September, 1836, and January 20, 1840, were made under the principles of the common law;

(2) Under the Constitution and Statutes of the Congress of the Republic, a "grant" meant a final title or patent.

■ We gain a clearer understanding of this Republic grant when we place ourselves in the historical setting in which these events transpired. Davis v. Bond, Tex.Civ.App., 141 S.W.2d 979, affirmed 138 Tex. 206, 158 S.W.2d 297. See also Frost Nat. Bank v. Boyd, Tex.Civ.App., 188 S.W.2d 199, affirmed 145 Tex. 206, 196 S.W.2d 497, 168 A.L.R. 1326. When we follow the footsteps of the early Republic lawmakers, we can more easily discover their intent, and since this was a Republic grant, her laws as they then existed must prevail. When we compare the Mexican laws with those of the Republic, we learn that the Constitution and Congress of the Republic, at the time of the grant in question, had already departed from the Mexican system and had incorporated the English system of land measurements into the laws of Texas.

When Moses Austin came to Texas in the winter of 1820 to lay his colonization plans before Governor Martinez, Mexico was already preparing to declare her independence from Spain. Shortly thereafter Moses Austin died. On February 21, 1821, Iturbide declared the Mexican independence from Spain. Stephen F. Austin determined to continue his father's colonization plan and came to Texas for a conversation with Governor Martinez, who asked for a positive statement of his plan. Austin, in the summer of 1821, submitted a plan by which he would promise each head of a family and each single man over age, 640 acres of land, 320 acres in addition for the wife, 160 acres for each child, and 80 acres for each slave. 1 Gammel 6. The plan met with favor, but several months later, on another trip to Texas, Governor Martinez, probably by reason of the change in governmental status, advised Austin that the Mexican Congress was then in session and that permission to colonize would need confirmation by the Mexican Government in Mexico City. 1 Gammel 6-7. A twelve hundred mile trip, through the dangers, deserts and mountains of Mexico, brought Austin to Mexico City, there to find that Iturbide had caused himself to be proclaimed Emperor and that enmity existed between the Emperor and Congress. The first step toward a lawful colonization was not taken until January 4, 1823, when the Junta Instituyente, dominated by Iturbide, adopted its general colonization law. 1 Gammel 9.

To a people born to the civil law, Austin's plan to give lands measured in acres and sections of 640 acres, perhaps sounded strange, for the colonization law refused to adopt it. The civil law concept of land and land measurements was in different units, and the new law stated:

"Art. 5. The measurement of land shall be the following: establishing the vara, at three geometrical feet; a straight line of five thousand varas shall be a league; a square, each of whose sides shall be one league, shall be called a sitio; and this shall be the unity of counting one, two, or more sitios; five sitios shall compose one hacienda.

"Art. 7. One labor shall be composed of one million square varas, that is to say, one thousand varas to each side, which measurement shall be the unity for counting one, two, or more labors. These labors can be divided into halves and quarters, but not less.

"Art. 8. To the colonists, whose occupation is farming, there can not be given less than one labor, and those

whose occupation is stock raising there cannot be given less than one sitio." Colonization Law of 1823, 1 Gammel 27, 28.

On February 18, 1823, by decree of the Emperor of Mexico, it was ordered that Austin should "grant to each head of a family, one labor or one league, agreeably to the occupation which he may profess; * * * it being understood, that to the colonist, who besides farming also dedicates himself to the raising of stock, there may be granted a league and a labor, in conformity with the 8th article of said law." (Referring to the Colonization Law, supra.) Decree No. 8 of the Emperor, 1 Gammel 30.

Mexico was in a state of turmoil following her revolt from Spain, and after Iturbide decreed the Colonization Law he was ousted as a tyrant by Mexican patriots. Mexico declared Iturbide's coronation void and also nullified all his decrees, including the Colonization Act. Beginning anew, Austin was able, on April 14, 1823, to obtain from the new government a confirmation of his concession to colonize. Decree of Supreme Executive Power. 1 Gammel 33. The Mexican provisional government, on August 18, 1824, through its Congress, passed the National Colonization Law and decreed, with reference to colonists, that no lands could be colonized within twenty leagues of the limits of any foreign nation, nor within ten leagues of the coasts, without prior approval of the supreme executive power. It imposed other restrictions,

guaranteed certain contracts, but prohibited a unit, in the same hands, of property more than "one league square of land, suitable for irrigation, four square leagues in superficies, of arable land without the facilities of irrigation, and six square leagues in superficies of grazing land." Decree No. 72, National Colonization Law, 1 Gammel 39, § 12. Contracts were then made between settlers and the Mexican Government in conformity with the law of August 18, 1824. 1 Gammel 47–55. Mexico adopted its Federal Constitution on October 4, 1824.

On March 24, 1825, the State of Coahuila and Texas, in its Decree No. 16, pursuant to the federal law, also decreed its colonization law. It continued the border and littoral league reservations, guaranteed the former contracts made by empresarios, and expressly stated the land measures:

"Art. 11. A square of land, of which each side is one league of 5,000 yards, or, what is precisely the same, 25,000,-000 yards of surface, shall be named a lot, and this shall be considered as the unity in counting one, two, or more lots: thus, also, the unity in counting one, two, or more subdivisions shall be 1,000,000 yards of surface, or a square of 1,000 yards each side, which is the measure of one subdivision: the yard used in these measurements shall be three geometrical feet."

The law stated the quantities of land that could be allotted to projectors, families and single persons. 1 Gammel 99, 101.[1]

1. "Art 12.—Supposing the quantity of land above stated to be the unity, and a division of the land being made, when distributed into grazing lands and those adapted for tillage by means of irrigation, or not requiring irrigation;—this law grants to such projector or the projectors of plans for colonization, for each 100 families which they convey, and establish in the State, 5 lots of grazing land, and 5 subdivisions, of which at least one-half shall be arable land, not requiring irrigation; but they shall only receive this premium for as many as 800 families, even if they should introduce a greater number; nor shall any fractional number,

be it what it may, which does not amount to 100, give them a right to any recompense, even in proportion to its amount.

"Art. 13.—If any one or more projectors shall, on account of the families they have conveyed, obtain, agreeably to the preceding article, more than 11 square leagues, the whole of the land shall be granted to them, but they shall be under the obligation of selling the surplus within 12 years; * * *

"Art. 14.—To each of the families included in a project of colonization, whose sole occupation is the cultivation of the land, one division of land shall be given;

On April 6, 1830, the Mexican Congress forbade further colonization by persons from the United States. On April 28, 1832, the Congress of the State of Coahuila and Texas, by its Decree No. 190, repealed Decree No. 16, its general colonization law, and provided for colonization by Mexican citizens. 1 Gammel 299. The law permitted settlement within the ten littoral leagues along the coast and made provision for land distribution in accord with the Mexican land system.[2]

On March 26, 1834, the Congress of the State of Coahuila and Texas, by its Decree No. 272, repealed Decree No. 190, and provided for sales of vacant lands of the State at public auction rather than by colonization. In its second article, it stated its land measurements:

> "A vara of three geometrical feet, and a mile consisting of a thousand varas, shall be the unit for lineal measure; and a millonada containing a million square varas, or what is the same thing, a square measuring a thousand varas on each side shall be the unit for area measure." 1 Gammel 357.

The State of Tamaulipas, on December 15, 1826, by Decree No. 42, also enacted its colonization law in pursuance of Federal Decree No. 72, as had been done by the State of Coahuila and Texas. It adopted the same system of land measurements. 1 Gammel 454, 456.

The mounting problems were faced by the colonists, and on November 7, 1835, they declared their rights, yet asserted their loyalty to and defense of the Mexican Constitution of 1824. 1 Gammel 522. On November 13th, to face the perilous days ahead, the colonists adopted a provisional government and a provisional constitution. Article XIV of the "Plan and Powers of the Provisional Government of Texas," declared that all "Land Commissions, Empressarios, Surveyors or other persons in anywise concerned in the location of land, be ordered, forthwith, to cease their operations during the agitated and unsettled state of the country." The next Article guaranteed existing rights and provided that all persons "now in Texas, and performing the duties of citizens, who have not acquired their quantum of land, shall be entitled to the benefit of the Laws on Colonization under which they emigrated; and all persons who may emigrate to Texas during her conflict for Constitutional Liberty, and perform the duties of Citizens, shall also receive the benefits of the law under which they emigrated." 1 Gammel 912–913. Having closed the Mexican land offices, and having guaranteed existing obligations, the government then turned to the immediate task of raising an army.

On November 26, 1835, Governor Smith signed an ordinance of the General Council of the Provisional Government of Texas, which had for its purpose the raising of a regular army. Section 5 of that law stated that every non-commissioned officer and private would receive, "and it is hereby granted to him, his heirs, legal representatives or assigns, one mile square or six hundred and forty acres of land, in Texas * * *." 1 Gammel 925.

---

should it also breed cattle, it shall receive also of grazing land a sufficient quantity to complete one lot; and if it only breeds cattle, it shall have of grazing land an extent of 24,000,000 superficial yards."

Articles 15 and 16 relate to lands allotted bachelors and other persons. 1 Gammel 99, 101.

2. "Art. 8. To each of the families comprised in the contract mentioned in article 2, one day for watering, and one labor shall be granted, or two labors, should the land be temporal (land cultivated during ordinary rains), and a lot sixty yards square, whereon said family shall erect a dwelling within two years, otherwise they shall forfeit the privilege. Should a family have neat stock, horse kind, or small stock, exceeding one hundred head of the two former kinds, or six hundred of the latter, the same shall be entitled to one sitio of grazing land."

Article 9 stated the usual measuring system. Decree 190, Congress of the State of Coahuila and Texas, 1 Gammel 299–300.

"Acres",[3] "sections"[4] and the "English mile"[5] thus appeared in the government and law of Texas for the first time. These were familiar terms to settlers from the United States. Though Austin had bar-gained on that basis, his contract was closed on the basis of Mexican labors, leagues, sitios and haciendos. On December 5, 1835, another law was passed which had for its purpose the organization and

3. "Acre. A quantity of land containing one hundred and sixty square rods of land, in whatever shape. Cro. Elizabeth 476, 665; 6 Co. 67; Co.Litt. 5b." 1 Bouvier's Law Dictionary, Rawle's Third Revision, 1914, p. 115.

"Tanfield moved that those houses passed; for in grants, especially in de-vises, the exposition of the words shall be according to the common intendment of the grantor, and of the ley-gents: as if one builds an house upon *Black Acre*, and maketh feoffment of *Black Acre*, the house shall pass; * * *. In An-drews' case it was adjudged, that if one brings an ejectione firmae, or a praecipe of *100 acres*, it shall be according to the statute-measure; but if he bargains and sell *100 acres* of land, that shall not be according to the statute measure, but after the usual account in the country. * * * But if a man seised of three houses and *three acres* of land in D. de-vise his land, and one of his houses in D. there the other two houses pass not; for his intent is apparent therein, that but one house only should pass." Ewer v. Hayden, Cro. Elizabeth 476; 78 Eng. Reports 727 (1596).

"A question was between them for an assurance of land.—Popham said, that it had been resolved by all the justices, that if one be obliged to assure twenty *acres* of land, the *acres* shall be accounted according to the estimation of the coun-try where the land lies, and not ac-cording to the measure limited in the stat-ute." Some v. Taylor, Cro. Elizabeth 665, 78 Eng.Reports 903 (1599).

"The burial place of the dead has among all nations and in all times been deemed sacred, and our Anglo-Saxon forefathers called it 'God's Acre.' " Hertle v. Rid-dell, 127 Ky. 623, 106 S.W. 282, 286, 15 L.R.A.,N.S., 796.

"A definite measure of land, original-ly as much as a yoke of oxen could plough in a day; afterwards limited by statutes 5 Edw. I, 31 Edw. III, 24 Hen. VIII, to a piece 40 poles long by 4 broad (4840 Square yards) or its equivalent of any shape. 'Normally, it was understood to consist of thirty-two furrows of the plough, a furlong in length.' A. S. Ellis in N. & Q. 16 Sept. 1882, 230.

" * * * 1377 Langl. P. Pl. B. vi. 4, I have an half acre to erie. 1420 Palladius on Husb. v. 15. Thre hors a yere an acre wel sufficeth. 1466 Manners & Househ. Exps. 326. I have geven to John Ham-ondes wyffe iiij. hakeres of wete. 1494 Fabyan vii. ccxxii. 246. An acre con-teyneth xl. perches in lenfth, and iiii. in brede: & iiii. acres make a yerde, and v. yerdes make an hyde, and viij. hydes make a knyghtes fee, by the whiche rea-son, a knyghtes fee shuld welde clx. acres & that is demed for a ploughe tyll in a yere. 1502. Arnold Chron. (1811) 173. Of what length soo euer they be, clx. perches make an akir. 1542 Recorde Grounde of Artes 208 (1575) A Rod lande, whiche some call a roode, some a yarde lande and some a Farthendele, 4 Farthendels make an Acre * * * 1602. Carew Cornwall 36a, Commonly thirtie Acres make a farthing land, nine farthings a Cornish Acre, & foure Cornish Acres, a Knight's fee. 1610 Shaks. Temp. i.i. 70 Now would I give a thousand furlongs of sea for an acre of barren land. 1624 Capt. Smith Virginia iv. 125 English Wheat will yeeld but sixteen bushels an aker * * * 1691. Petty Pol. Anatomy 52, 121 Irish Acres do make 196 English State Acres * * *." A New English Dictionary on Historical Principles, edited by James A. H. Murray, published in Oxford at the Clarendon Press (1888).

4. "The term 'sitio ganado mayor' is a tech-nical Spanish and Mexican legal term, as well established, defined, and known as a section or township in the surveys of the United States. It was a square, the four sides of which each measured 5,000 varas." Hamilt.Mex.Law, 103.

"A conveyance of a *sitio* deeded as certain a form and quantity of land as a conveyance of a *section*. To convey a section would always mean a square, the side pointing to the four cardinal points, *each one mile in length, containing 640 acres*." United States v. Cameron, 3 Ariz. 100, 105, 21 P. 177, 178.

5. "The land mile is more common to those whose business is upon the land,—to landmen; while the sea mile is the only one recognized by those who navigate the sea,—by seamen. The first named was legalized in the reign of Queen Eliza-beth, known as 'statute mile,'—or 'English mile,' or 'English statute mile' * * *."

establishment of an Auxiliary Volunteer Corps. 1 Gammel 951. The volunteers were promised *"one mile square, or six hundred and forty acres of land,* to be selected out of the public domain of Texas." Sec. 5. "An Ordinance and Decree to Organize and establish an Auxiliary Volunteer Corps to the Army of Texas * *." 1 Gammel 951, 952. On December 18, 1835, still another law was passed which had for its purpose the augmenting of the regular army by creating a Legion of Cavalry. Section 4 of that Act provided that the Cavalry would receive "the same bounty in land as the Auxillary Corps, to-wit: *six hundred and forty acres of land."* 1 Gammel 997.

The Constitution of the Republic was adopted in March and ratified in September of 1836. Article IV, Section 13, provided: "The Congress shall, as early as practicable, introduce, by statute, the common law of England, with such modifications as our circumstances, in their judgment, may require; and in all criminal cases the common law shall be the rule of decision." 1 Gammel 1074. Artical VI, Section 9, significantly provided: "All grants and commissions shall be in the name and by the authority of the Republic of Texas, shall be sealed with the great seal, and signed by the President." 1 Gammel 1076.

Section 1 of the Schedule provided, "that all laws now in force in Texas, and not inconsistent with this Constitution, shall remain in full force, until declared void, repealed, altered, or expire by their own limitation." Section 7 of the General Provisions provided:

"So soon as convenience will permit, there shall be a penal code formed on principles of reformation, and not of vindictive justice; and the civil and criminal laws shall be revised, digested, and arranged under different heads; and all laws relating to land titles shall be translated, revised, and promulgated." Constitution of the Republic, General Provisions, § 7, 1 Gammel 1079.

Section 10 of the General Provisions of the Constitution did many things. It nullified all claims and grants in violation of the Constitution of 1824. It invalidated surveys and grants made while others were waging war. It accorded all citizens of Texas the same portion of land as received by the colonists. It equalized land portions among the people. It protected the orphans in their land claims to the extent that their parents were entitled to land under the colonization laws. It provided that "no survey or title which may hereafter be made shall be valid, unless such survey or title shall be authorized by this Convention, or some future Congress of the Republic." 1 Gammel, 1079–1081.

When the first Act establishing the General Land Office was enacted on December 22, 1836, Section 24 stated the lands which would be granted persons arriving after January 1, 1837. Upon certain conditions, heads of families were allowed 1280 acres of land, single men were allowed 640 acres,

Rockland, Mt. D. & S. Steamboat Co. v. Fessenden, 79 Me. 140, 146, 8 A. 550, 551.
"The Plymouth grant was made in 1620, and the Muscongus grant sometime between 1620 and 1635. The statute or English mile was adopted as the standard of land measurement in the 35th year of the reign of Elizabeth, 1593. * * * The statute mile measures 5,280 feet on the land; * * *.
"It would therefore appear that the statute mile for measuring the land and the marine mile for measuring the sea by the use of the log were established and

went into use at about the same time in England, and somewhere from 30 to 40 years before the grant in question was made. It is then reasonable to infer that all the parties to these grants, made so soon after the adoption of these different measurements for the land and for the sea, must have been familiar with the purposes for which these different standards were used, and it is not unreasonable to assume that they contemplated these measurements to be practically applied, * * *." Lazell v. Boardman, 103 Me. 292, 297, 69 A. 97, 99.

and a like amount when they married. 1 Gammel 1276–1284. However, the price for surveying was declared to be "three dollars for each *Castillian* lineal mile," (1 Gammel, 1281), which shows that the Congress was conscious of the differences between the Spanish and English system.

On June 12, 1837, the Land Office Act was supplemented. 1 Gammel 1323–1326. On the same day still another act was passed which is brief but important. It provided, "That it shall be the instructions of the president, to cause so much of the vacant lands of the republic to be surveyed and *sectionized,* in tracts of *six hundred* and *forty,* and *three hundred* and *twenty* *acres* each, as will be sufficient to satisfy all claims against the government * *." 1 Gammel 1326. The Constitution of the Republic had already voiced its disapproval of the Spanish and Mexican land system, for it stated in Section 10 of its General Provisions: "And *with a view to the simplification of the land system,* and the protection of the people and the government from litigation and fraud, a *general land office shall be established, where all the land titles of the Republic shall be registered,* and the whole territory of the Republic shall be *sectionized,* in a manner hereafter to be prescribed by law * * *."

On December 14, 1837, before the Land Office had actually opened, the Congress passed an act to reduce into one act and to amend the several acts relating to the General Land Office. 1 Gammel 1404. That act, like the former one, recognized the obligation of the former sovereign, and then made provision for Republic grants in terms of acres and sections. Section 7 of the Act provided that a patent shall be signed by the President of the Republic, countersigned by the Commissioner of the General Land Office or his Chief Clerk; and bear the seal of the General Land office. This section made operative what Article VI, Section 9, of the Constitution had called a "grant." Section 37 of the same act authorized the president of the republic to employ a surveyor and cause a survey of a sufficient quantity of land to satisfy the holders of all land scrip. The surveyor's fees, departing from the former Castillian mile, were not to be in excess of "three dollars for each *English lineal mile actually run."* 1 Gammel 1416.

It is manifest that the Congress sought to protect the colonists by a recognition of their rights expressed in the earlier laws even before the independence.[6] Those rights were usually expressed in terms of leagues and labors. On some few occasions, the Congress of Texas passed other laws which used those terms.[7] But from the time of the provisional government, the

---

6. Joint Resolution, Dec. 21, 1836, stating, "That this congress have *no right to interfere in the vested rights* of any individual * * *.

"The principle, then, being settled that the nation, or the government which separates from another nation or government, succeeds to all the vacant domain within its limits, the doctrine is equally clear that she can dispose of it as she pleases. Although revolutions do not divest vested rights, yet such an alteration in government as changes its past political relations, operates as a repeal of all laws previously existing, so far as they may be construed to impart rights emanating from the government after revolution. The declaration of independence established the sovereignty of Texas and gave the government entire control over its vacant domain." Board of Land Commissioners v. Bell, Dall.Dig. 366.

7. An Act to provide for the protection of the Northern and Western Frontier, which provided that a site for a fort should be selected with three leagues square of land, but provided also that it should be surveyed into 160 acre tracts. 2 Gam. 15–17.

An Act for the Relief of R. M. Williamson, agent of Benjamin R. Milam, which provided for issuance of ten certificates each for a league and labor of land. Milam, however, had been killed in December of 1835 while storming San Antonio, which would indicate that this was in recognition of an earlier existing right.

An Act for the Relief of John White provided for the issuance of two certificates, each for a league and labor of land. 2 Gam. 58.

An Act for the permanent location of the seat of government provided that a

laws of the Republic [8] demonstrate that there was an intent to depart from the strange Spanish or civil law system.

On January 20, 1840, the Texas Congress passed a law which generally adopted the common law. It provided:

"That the common law of England (so far as it is not inconsistent with the constitution or the acts of Congress now in force), shall, together with such acts, be the rule of decision in this republic, and shall continue in full force until altered or repealed by Congress.

"That all laws in force in this republic prior to the first of September, one thousand eight hundred and thirty-six (except the laws of the consultation and provisional government, now in force, and except such laws as relate exclusively to grants and the colonization of lands in the State of Coahuila and Texas, and also such laws as relate to the reservation of islands and lands, and also of salt-lakes, licks and salt-springs, mines and minerals of every description, made by the general and state governments) be, and the same are hereby repealed." 2 Gammel 177–178.

There is authority which holds that the general adoption of the common law enlarged rights which had vested under the Spanish law. State v. Texas Land & Cattle Co., 34 Tex.Civ.App. 460, 78 S.W. 957; See footnote, State v. Balli, Tex.Civ.App., 173 S.W.2d 522, 543. But it is not necessary that we rest our decision upon that authority.

The law which generally adopted the common law, repealed all laws in force prior to September 1, 1836. The same law, however, by an express exception, stated that the laws prior to September 1, 1836, would continue to apply in the case of land grants of the State of Coahuila

---

site be selected which consisted of not less than one nor more than four leagues. However, the price for the land was not to be more than three dollars per acre. 2 Gam. 161.

8. Joint Resolution, Dec. 6, 1836, provided that certain land scrip be sold at not less than "fifty cents per acre." 1 Gam. 1128.
   Joint Resolution, Dec. 6, 1836, provided that the president raise twenty thousand dollars through sale of land scrip at not less than "fifty cents per acre." 1 Gam. 1136.
   Joint Resolution, Dec. 10, 1836, provided that the president sign land scrip to the amount of "five hundred thousand acres * * *" and provided, that the scrip shall not be sold for less than "fifty cents per acre." 1 Gam. 1136.
   Act Appropriating Lands to Operate the Post Office Department during 1837, Dec. 21, 1836, provided that persons holding claims against the post office department may satisfy the claims "in land at fifty cents per acre * * *." 1 Gam. 1256–1257.
   Joint Resolution, Nov. 16, 1837, provided that one "Nelson Jones is entitled to twelve hundred and eighty acres of land as a bounty * * *." 1 Gam. 1332.
   Act Amending Acts Granting Bounty Lands, Dec. 4, 1837, provided "That the laws in existence granting bounty lands to those who have served in the army be so amended as to grant to all who have served three months in the army, three hundred and twenty acres of land; to all who have served for six months, six hundred and forty acres; to all who have served nine months, nine hundred and sixty acres, and to all who have served twelve months or upwards, twelve hundred and eighty acres." 1 Gam. 1368.
   Act Granting Lands to those who Fought in Battle of San Jacinto and other battles, Dec. 21, 1837, provided that such soldiers should receive six hundred and forty acres of bounty lands upon certain conditions. 1 Gam. 1450.
   Other Acts which treated the public domain in terms of acres and sections are: An Act to provide for protection of the Northern and Western Frontier, 2 Gam. 15, 17; An Act to extend donations of land to late emigrants, 2 Gam. 35; An Act for the relief of certain Orphan Children, 2 Gam. 41; Supplementary Act to dispose of Galveston and other islands of the Republic of Texas, 2 Gam. 61; An Act to exempt certain property, 2 Gam. 125, 126; An Act to appropriate certain lands for the establishment of a general system of education, 2 Gam. 134; An Act for the permanent location of the Seat of Government, 2 Gam. 161.
   See State v. Delesdenier, 7 Tex. 76, 101–106.

and Texas. The law was silent about Republic grants, if any, between September 1, 1836, and January 20, 1840. It may be that the members of Congress in stating that the civil law would apply to Coahuila grants and remaining silent on that subject as to Republic grants, believed that "grants" as defined by the Constitution had not yet been made, because the Land Office had been closed almost continuously. It may be that the recognition of civil law with reference to Coahuila grants and the silence as to Republic grants demonstrated an intent that the common law would apply to Republic grants.

The Congress was conscious of the public domain and it was not through oversight that the statute adopting the common law failed to state that the laws prior to September 1, 1836, would apply to Republic grants. Land was the Republic's greatest resource. Land was its sole source of revenue.

The members of the Fourth Congress of the Republic understood their past acts when they voted on the law which generally adopted the common law of England. They knew the Constitution had ordered that "* * * all laws relating to land titles shall be * * * revised." They knew the Constitution had ordered that the land system be simplified; that this should be done by creating a general land office where all titles shall be registered, and that the Republic should be sectionized. They knew that they had obeyed those mandates. They knew that even before the Declaration of Independence, and on numerous occasions since, they had passed many laws in terms of acres, sections consisting of 640 acres, and English miles. They knew further that surveyors were being paid on the basis of English miles and that surveys had to be interpreted into such terms rather than in terms of the Mexican statutory mile, which, translated out of Decree 272 of March 26, 1834, by the Congress of the State of Coahuila and Texas was 3333 feet rather than 5280 feet. 1 Gammel 357. They knew that the Constitution had been adopted and

that by statute the common law had already been expressly adopted in criminal actions. They also knew that three prior sessions of the Texas Congress had exacted a variety of statutory laws on many subjects, that land legislation had been generally enacted, and that they had generally dealt with the public domain in terms of familiar common law and statutory terms of the states from which they had emigrated. They knew also that the same law which provided that the laws in force prior to September 1, 1836, would continue to apply to grants by the State of Coahuila and Texas, also stated that the laws of the consultation and provisional government, now in force, shall also continue. Among those laws were several which promised persons lands described as "one mile square or six hundred and forty acres of land." They knew that they had already adopted many land laws which were out of harmony with the Spanish and civil law, and that they did not intend to retreat from what they had done. To what civil law sources or Mexican statutes does one go to discover the meaning of the terms, "acre", "section" or "English Mile"? It can hardly be urged that prior to 1840 only the civil law was operative.

When John Talley, sometime between August, 1838, and September, 1839, meandered the line above Copano Bay, he was measuring acres, English miles, and sections consisting of 640 acres, as his field notes tell us. Farley v. Deslonde, 58 Tex. 588. He was interpreting his distances in terms of English miles. He was sectionizing the Republic under the rules of a land office which had been created by mandate of the Constitution to simplify the land system. Instead of carving out civil law labors, leagues, sitios, or haciendas, he was operating under a land measuring system that Austin eighteen years earlier had unsuccessfully offered to the Mexican authorities.

We can not disregard this body of constitutional and statutory law. Barrett v. Kelly, 31 Tex. 476, 481, speaking of the period between March 2, 1836, and January

20, 1840, stated: "The principles declared in the Constitution of 1836, and the statutes of the state from that time to 1840, together with the old Mexican laws, formed the code of laws for that period." Courand v. Vollmer, 31 Tex. 397, states: "The constitution of 1836, and the acts ·of three congresses had already furnished a collection of laws sufficient for a superstructure, but the basis or foundation of the judicial system was the civil law, and it was this which formed the rule of decision up to January, 1840." The new government, with reference to land grants and land measurements promptly expressed its displeasure with the Mexican system, departed from it and embarked upon a more familiar system. Board of Land Commissioners v. Bell, Dall.Dig. 366, 368. We should not by construction return to that which the Republic had abandoned.

The second reason that the common law shore line was intended is that the grant, as thus defined by Constitution and statute, was not made until 1841, when the President signed the sealed grant. The Constitution had provided that "All grants * * * shall be * * * sealed with the great seal, and signed by the President." Art. VI, § 9, Const. of Republic. The Act which reduced the various Land Office Acts into one Act carried the Constitutional requirement forward and provided "that all patents * * * shall be under the seal of said office; shall be signed by the president of the republic, and countersigned by the commissioner of the general land office, or by the chief clerk thereof." 1 Gammel 1404, 1405.

This case does not concern the equitable or inchoate rights which may exist between individuals. It does not concern rights which may exist under earlier Mexican laws or subsequent legislative acts of the State of Texas. See, Talley v. Lamar County, 104 Tex. 295, 137 S.W. 1125. It concerns the definition of a grant as defined by the Constitution and laws of the Republic.

When we view the term "grant" contemporaneously with the Fourth Congress of the Republic, its construction is clarified.

Few, if any, grants had been made by the Republic prior to the adoption of the common law, for the Land Office had been closed pending congressional investigations. Moreover, in early Texas history, a patent or a grant had a different significance than later obtained. In early Texas, locations or surveys could be abandoned or "floated." Until the patent was issued, one could change his mind, re-locate and re-survey, and obtain a different tract of land. As stated in Hollingsworth v. Holshousen, 17 Tex. 41: "A party may abandon his location and survey at any time before his certificate is merged in a patent, provided he does not thereby interfere with the rights of any other person." Jones v. Lee, 86 Tex. 25, 22 S.W. 386, 1092; Johns v. Pace, 26 Tex. 270; Wyllie v. Wynne, 26 Tex. 42. That practice was later terminated by statute. Pasch Dig., Art 4574; Jones v. Lee, supra; Keith v. Guedry, 103 Tex. 160, 122 S.W. 17, 125 S.W. 5; Texas-Mexican Ry. Co. v. Scott, 60 Tex.Civ.App. 482, 129 S.W. 1170, 1179. The early Texas cases decided under the Constitution of 1836, so construe the term "grant." Hosner v. De Young, 1 Tex. 764, 769, states:

"That the fee being in the government until it passes into a perfect grant, no suit can be sustained to compel the government to divest itself of the title until the political authority has prescribed the mode in which it shall be done; that in all such cases the political authority can establish, alter and modify such regulations from time to time, as may be deemed necessary in maturing an imperfect into a perfect title; that this control is necessary to the protection of the public domain, and a consequence resulting from the fee being in the government."

League v. De Young, 2 Tex. 497, 500; Smith v. Taylor, 34 Tex. 589, 607; Jones v. Menard, 1 Tex. 771. Hart v. Gibbons, 14 Tex. 213, states:

"The question cannot be regarded as open in this court at this time, as, since the case of Hosner v. De Young (1 Tex. [764]), it has been· the uniform

doctrine of the court that the State did not surrender the dominion and control of the public domain until final and complete title had been issued. * * * The pretension that an incipient title to a part of the public domain creates such a vested right as to place it beyond the control of legislation cannot be sustained as a conclusion either from the legislation or from any judicial decision.

"It has been contended that the authority given by statute (Hart.Dig., art. 3230) to sue for land on which the plaintiff had located a valid certificate is a recognition of the fact that the fee, by such location, had passed from the State. This is not a fair inference. It amounts to nothing more than this: that the person holding the incipient title shall recover and hold against all who cannot show a better title, but does not conclude the State. It is competent for the State to say what degree of title less than the fee shall be sufficient to sustain an action for the protection of the rights of the party, whatever they may be, against those who have not an equal or superior right. This the State may well authorize without a relinquishment of the fee in the land sued for."

And the distinction between a grant and an equity in land is further explained in Hamilton v. Avery, 20 Tex. 612:

"For instance, if he have a survey and fail to return it to the general land office in the time, within which these rules make it his duty to return it, the State may waive this neglect of duty on his part, and allow further time to do it; and if he should comply with this requisition, his original, incipient right to the land is preserved in its full vigor, if between the time he should have returned the field-notes and the time of the act of relief, the government has not granted the land by perfect title to another. Hart v. Gibbons, 14 Tex. [213], 216. The same principle is maintained in the case of

Warren v. Shuman, 5 Tex. [441], 456; Lewis v. Mixon, 11 Tex. [564], 670; and Jennings v. De Cordova [20 Tex. 508], decided at this term. In all the cases of this character, the right of the party had legally attached to the land, by the performance of duty in some of the steps; by a legal survey, pre-emption settlement, etc.; and this is what is called an equity. As soon as the party was in default, by not performing a further duty enjoined upon him, the obligation of the government to make a *grant* to that land ceased to be imperative. None of its officers could be forced, by judicial process, to recognize it as a subsisting right." See also, Keith v. Guedry, 103 Tex. 160, 167, 122 S.W. 17, 125 S.W. 5.

■ Dicta in certain landmark opinions have stated that the civil law applies to land grants before January 20, 1840, but no case has been found which so applied the rule to a Republic grant. As a general workable rule, the principle is helpful in most cases, but as a rule applicable to rights in a Republic grant, the rule is inapplicable. Miller v. Letzerich, 121 Tex. 248, 49 S.W.2d 404, 85 A.L.R. 451, was concerned not with a Republic grant, but with Mexican and Spanish grants. The same is true of Manry v. Robison, 122 Tex. 213, 56 S.W.2d 438, and State v. Grubstake Inv. Ass'n, 117 Tex. 53, 297 S.W. 202, and Barrett v. Kelly, 31 Tex. 476. Motl v. Boyd, 116 Tex. 82, 286 S.W. 458, wrote about statutory law pertaining to many things, but statutory law pertaining to Republic grants was not one of them. The land there concerned was patented by the State of Texas, seventeen years after the common law had been adopted. The Court in Motl v. Boyd was not concerned with whether the common law was applicable, but was in search of a rule of the common law. Of course, the civil law was applicable up to January 20, 1840, in a vast area of contract and other law, which was untouched by contrary constitutional and statutory law, as is illustrated by such cases as Holdeman v. Knight & White, Dall.Dig. 566; Scott v. Maynard, Dall.Dig.

548; Selkirk v. Betts & Co., Dall.Dig. 471; Hall v. Allcorn, Dall.Dig. 433.

The proof well supports the appellees in their location of the common law shore line. The State, however, failed to prove the civil law shore line. The State offered the testimony of its surveyor with reference to hearsay information about the tidal elevations. The Court on objection excluded the testimony and also certain unauthenticated photostatic copies of documents showing tidal data published by the U. S. Coast and Geodetic Survey. By reason of the law points already discussed, even if the data had been introduced and had proved the civil law shore line, it would not affect the result of the case. However, the trial court correctly excluded the documents and the testimony based upon the documents which were unauthenticated. Reed v. Barlow, Tex.Civ.App., 157 S.W.2d 933; Taylor v. McLennan County, Tex. Civ.App., 120 S.W.2d 134.

The judgment is affirmed.