**J. W. LUTTES et al., Appellants,**

v.

**STATE of Texas, Appellee.**

No. 3348.

Court of Civil Appeals of Texas.

Waco.

March 22, 1956.

Rehearing Denied April 19, 1956.

Davenport & Ransome, Brownsville, W. G. Winters, Jr., R. H. Whilden, Houston, for appellants.

John Ben Shepperd, Atty. Gen., J. Arthur Sandlin, Asst. Atty. Gen., for appellee.

TIREY, Justice.

The action is one in trespass to try title (non jury). Appellants' statement of the nature and result of the suit is substantially as follows: J. W. Luttes and the Shell Oil Company brought this suit against the State of Texas by authority of resolution passed by the 53rd Legislature; and the action involves title to 4,086.61 acres claimed by plaintiffs as an accretion to the eastward face of Potrero de Buena Vista Grant, which bounds on Laguna Madre in Cameron County, Texas. It is undisputed and the trial court found:

1. The Potrero de Buena Vista Grant was originally granted by the State of Tamaulipas, Republic of Mexico, a former sovereign, to Manuel de la Garza Sosa by proceedings begun September 1, 1827, and completed January 24, 1829, through an act of Judicial Possession under the laws then in effect.

2. At the time of the grant by the State of Tamaulipas to Manuel de la Garza Sosa, the Potrero de Buena Vista was a riparian grant fronting on the Laguna Madre.

3. The eastern boundary of the Potrero de Buena Vista Grant at the time it was titled to Manuel de la Garza Sosa was Laguna Madre.

4. The grant by the State of Tamaulipas, Republic of Mexico, to Manuel de la Garza Sosa was duly recognized and confirmed by an act of the Legislature of Texas approved February 10, 1852, entitled "An Act to Relinquish the Right of the State to Certain Lands Therein Named," being Confirmation No. 38 in said act to Manuel de la Garza Sosa of "six and a fraction leagues," called "Buena Vista."

5. Through mesne conveyances and a regular chain of title from and under Manuel de la Garza Sosa, J. W. Luttes holds title to all of the Potrero de Buena Vista Grant which is material to a determination of the issues in this suit, subject only to an oil and gas lease in favor of Shell Oil Company.

6. Shell Oil Company holds an oil and gas lease from J. W. Luttes covering all of the Potrero de Buena Vista Grant which is material to a determination of the issues in this suit.

The trial court also found that in 1829 the waters of the Laguna Madre completely covered the lands in controversy at the time of the original Mexican grant involved in this suit, or at least if not completely covered at all times, such area was a part of the bed or shores of the Laguna Madre. The trial court likewise found that the area involved is a low-lying, flat area. It is a little above actual sea level and, while not circular in form, 'it has a flat, saucer-like topography, with the outer edges being somewhat higher than the inner portions, so that the general slope of the over-all area is from the outer edges toward the center. There are, however, several inner saucer-like depressions, located generally near the center of the area and running generally from southeast to northwest. The elevations over said mud-flats area, generally, runs from .25 feet above sea level to .80 feet above sea level, but with a few places reaching an elevation of 1.0 feet at the southeastern and northeastern perimeter, toward and near North Three Islands. West of the flats area, which is bounded on the west by the toe of the bluff of the main-

land, lies the mainland bluff proper, which bluff, between the line thereof and the toe thereof, is at places an abrupt drop of several feet, while along such bluff line itself running generally from one foot above sea level at some places to something over five feet above sea level at other places. These elevations, as well as the line of the toe of the bluff and that of the bluff line, are reflected on Plaintiffs' Exhibits Nos. 4 and 5, said Exhibit No. 4 reflecting the elevation contour lines of the flats area and the line of the toe of the bluff, while said Exhibit No. 5 reflects points of elevation over the flats area as well as up to the bluff line but without contour lines appearing thereon, and that the area involved in this action comprises some 4,086.61 acres, and consists of what has been referred to in the record as "mud-flats," lying to the east of the toe of the bluff on the Texas mainland and extending out into the Laguna Madre, and reflected pictorially as to shape, and by metes and bounds description, on Plaintiffs' Exhibit No. 4, which exhibit likewise reflects some of the surrounding territory, including Yucca Island and North Three Island. The portion of the area near Yucca Island between the red lines drawn near such Island and said Island itself, and the portion of such area near North Three Island east of the red line drawn west of said Island, all on said Plaintiffs' Exhibit No. 4, has in effect been disclaimed by the plaintiffs, through their motion for judgment and through their testimony offered on the trial to the effect that such portions of said area represented accretions to Yucca Island and to North Three Island, respectively, and did not represent accretions to the mainland.

Trial before the court resulted in a judgment that plaintiffs take nothing and that defendants recover from plaintiffs the area in question; from which judgment plaintiffs, J. W. Luttes and Shell Oil Company, have perfected their appeal.

The trial court filed Findings of Fact at plaintiffs' request, to many of which plaintiffs excepted, and requested amended and additional findings; and the court, responding to such exceptions and requests, made

some minor corrections and a few additional findings.

In the last paragraph of appellants' statement we find the following view: "It is apparent from the record that the trial judge began this case with a fixed conviction that the line of demarcation between fast land and seashore 'under the civil law is the highest tide in winter,' based on dictum in some of the older Texas cases, which has been considered and twice overruled by this Honorable Court; (State v. Balli [Tex.Civ.App.], 173 S.W.2d 522; Giles v. Ponder [Tex.Civ.App.], 275 S.W.2d 509) and at least twice by our Supreme Court (State v. Balli, 144 Tex. 195, 190 S.W.2d 71; Giles v. Basore, 278 S.W.2d 830). That conviction remains implicit in the trial court's Conclusions of Law and Findings of Fact, which are best considered as an able argument in support of the validity of that dictum as applied to the special facts of this case."

We also quote in full what appellants designate as a preliminary statement:

"The crux of this action is the location of the shore line of Laguna Madre along the Buena Vista Grant.

"On this question, appellants contend: First, the decision of the Supreme Court of Texas in State v. Balli, 144 Tex. 195, 190 S.W.2d 71, is stare decisis for the proposition that there is no substantial difference between the line of mean high tide and the line of highest tide in winter in Laguna Madre; Second, the Republic in adopting the common law in 1840 (2 G.L. of Tex. 177) and the Legislature in enacting the Relinquishment Act of February 10, 1852 (3 G.L. of Tex. 941) in effect, redefined the shore line of the Buena Vista Grant at the line of mean high tide; Third, there is actually no substantial difference in the Spanish and common law rules defining the shore; and Fourth, all the evidence in this action shows the periodic tide in Laguna Madre to be negligible. For

these reasons, and because the uncontroverted evidence in this action shows that the 4,086.61 acre mud flat in controversy here was formed through the imperceptible deposit of alluvion and is above both the line of mean high tide and the line of mean high tide for the winter months, the lands in controversy are now fast land.

"All of Eastern Cameron County is a part of the deltaic plain of the Rio Grande River. The lands involved in this suit lie in the middle of the north flank of this Rio Grande delta.

"This delta developed in three stages. In ancient times the Rio Grande emptied into the sea in what is now northern Cameron County, and in those ancient days, the Resaca de los Cuates was one of the main channels of the Rio Grande. This first period in the development of the Rio Grande delta has been identified in the evidence as the Colorado-de los Cuates phase.

"Through successive overflows and floods the Rio Grande built its deltaic plain higher and higher until finally it turned south in search for an easier path to the sea. This second period in the development of the Rio Grande delta has been identified in the evidence as the Del Tigre phase. Again, through successive overflows and floods, the Rio Grande built its delta higher and higher until it had to find an easier path to the sea. This last period in the development of the Rio Grande delta has been identified in the evidence as the Modern phase and is the present status of the Rio Grande.

"These three phases in the development of the Rio Grande delta are shown on Plaintiffs' Exhibit No. 8.

"A river delta has two principal characteristics: (1) beach and pro-delta deposits and (2) the river features. The beach and pro-delta de-

posits are the alluvion which is dumped by the river when it enters the sea. The river features are: (1) the channels and channel deposits, (2) the natural levees, and (3) the back swamps. All flowing streams carry alluvion and in time of flood they carry vast quantities of sand, silt, and other soils. When a river floods and overflows, it deposits this material on the banks. As flood follows flood, this bank grows higher and higher and higher and forms what is called a natural levee. The low lands behind these natural levees are the back swamps and the former river beds are the channels.

"The Rio Grande built a substantial delta during the Colorado-de los Cuates phase in the region of northern Cameron and southern Willacy Counties, and it extended far to the east of the present mainland. But much of the ancestral lobe of this old delta was washed and eroded away by a transgressing sea after the Rio Grande turned its flow south in the Del Tigre phase. The islands, the bluff line along the west side of the lands in controversy, and the peninsulas which extend out into Laguna Madre are all remnants of old natural levees built during the Colorado-de los Cuates phase.

"After the sea had transgressed and eroded away much of the delta formed during the Colorado-de los Cuates phase, a barrier island formed offshore. This barrier island is now known as Padre Island and the lagoon behind it as Laguna Madre.

"A composite map of Exhibits Nos. P–4, P–4A, P–4B, and P–4C is attached to this Brief as Appendix II. From this composite map and plaintiffs' Exhibit No. 9, which is the large aerial composite photograph, it is seen that the Resaco de los Cuates originally emptied into Laguna Madre through a break in the bluff line on the west side of the lands in controversy to the

northwest of U. S. Coast and Geodetic Survey Station 'Hike'.

"After the Rio Grande shifted its principal flow to the south, the Resaca de los Cuates continued to carry waters from the Rio Grande in time of flood and to drain the natural watershed through which it coursed. In carrying this runoff, the Resaca de los Cuates carried alluvion in its flow and deposited it in Laguna Madre in the area in controversy. Thus, through the imperceptible deposit of alluvion the lands in controversy in this suit were made little by little. Some accreted to the islands and some to the mainland. The development of this accretion is shown on Appendix III to this brief. The line where these accretions merged is shown on Appendix II in red.

"It was in this manner that the 4,086.61 acres in issue here was formed.

"Two automatic tide gauges are located in the southern basin of Laguna Madre: One, in the north end at Port Mansfield, sometimes called Red Fish Landing, and the other in the south at Port Isabel. A profile sketch of the Buena Vista mud flats is attached to this brief as Appendix I. This profile shows the comparative elevations of the mud flats and mean highwater in Laguna Madre as determined by data from the Red Fish Landing (Port Mansfield) tide gauge and a survey of the mud flats.

"Using the months of December, January, and February as winter months, the elevation of mean high winter tide is 0.149 feet below the 1929 datum plane. Thus, mean high winter tide is actually at a lower elevation than the line of mean high tide for the year."

Appellee's statement of the nature and result of the suit is substantially as follows: The statement on pages 1–4 inclusive in appellants' brief is substantially

correct, except as to the last paragraph, with which we do not agree. The trial court filed very thorough and comprehensive Findings of Fact and Conclusions of Law, all of which are strongly supported by the evidence. After pointing out the seashore definition by the Supreme Court in the Balli case, the trial court said in his 4th Conclusion of Law:

"Under the Civil Law and such definition, the boundary between the sovereign owner of the sea and its shores and the privately owned upland is that point or line reached by the year's highest wave (during normal weather conditions * * * not during severe storms or hurricanes), without regard to what time of the year the wave occurred and without regard to whether the wave was wind-driven or brought in by other forces of nature operating under normal conditions."

The Court further said in his 6th Conclusion of Law:

"I further conclude and find that some of the earlier Texas decisions fixed the boundary line between the sea and the upland at the line of the 'highest tide in winter', and that these decisions used such language in the sense of winter's highest wave (though not the highest crest of storm-driven sea water) and not in the sense of an astronomic tide. However, even if the rule of 'highest tide in winter' applied, in view of the fact, as hereinabove found, that the mud-flats area in controversy is covered by sea water from time to time in the winter, and as is also shown by the records of the tide staffs, I conclude and find that the area in controversy would still be a part of the bed and shore of the Laguna Madre, and not fast land."

As previously stated, the trial court decreed that plaintiffs take nothing by reason of their suit and that the fee simple title be vested in the State of Texas, and described the property by metes and bounds, and adjudged all costs against plaintiffs.

In the trial court's findings of fact and conclusions of law we find this preliminary statement:

"This is a suit in trespass to try title filed by the Plaintiffs, J. W. Luttes and Shell Oil Company, against the State of Texas, under Authority of House Concurrent Resolution No. 46, 53rd Legislature, Regular Session, approved by the Governor May 11, 1953. The suit involves the title to some 4086.41 acres of the mud flats area, described by metes and bounds in Plaintiffs' First Amended Original Petition and in the Judgment of the Court heretofore rendered in this suit, located in Cameron County, Texas along the East or Laguna Madre side of the original Mexican Potrero de Buena Vista Grant of land made by the State of Tamaulipas, Republic of Mexico, to Manuel de la Garza Sosa in the year 1829. Such Grant was a riparian one fronting upon and being bounded on the East by the Laguna Madre, a comparatively shallow bay, or arm of the Gulf of Mexico, located between Padre Island on the East and the mainland of Texas on the West. Said Mexican Grant was duly confirmed by Act of the Texas Legislature in 1852. Plaintiffs' claim of title to the mud-flats area involved is derived under this Grant and is based upon claimed accretions to the portion of the mainland covered by such Grant.

"It is undisputed, and it has been agreed between the parties to this suit on the trial hereof, that Plaintiff J. W. Luttes owns title to all of such Mexican Grant which is relevant to a determination of the issues in this suit, subject to an oil and gas lease, reflected in the record of the trial, in favor of the Plaintiff Shell Oil Company, and the record title, as such, is, therefore not in question.

"Admittedly, the mud-flats area in controversy was not a part or portion of the original Mexican Grant men-

tioned, such area in its then condition being a part of the bed or shores of the Laguna Madre. However, it is the position and contention of the Plaintiffs herein that since the original grant of land was made, such mud flats area, as the same now exists, has been added to the open face of said original grant of land fronting on the Laguna Madre, through the slow and gradual process of accretion and reliction and that such area has thereby become a part of the Texas mainland and such lands so covered by said Mexican Grant, lying to the West of such mud-flats area.

"The question primarily to be determined, therefore, is whether any portion of said mud-flats area involved has in fact, through accretion and reliction, become a part of the Texas mainland, and if so, the portion thereof that has so accreted to said mainland and so become a part of the property owned by the plaintiffs.

"On the trial of this cause before the Court without the intervention of a jury, the Court concluded that such mud-flats area involved had not been shown to have accreted to the mainland, as contended for by plaintiffs, and that such area has not in fact become a part of such mainland, and is not in fact 'fast land,' but remains a part of the bed and shores of the sea, and hence belongs to the State of Texas."

The Court then proceeded to set out certain findings of fact as follows:

"1st. The mud-flats area involved in this suit comprises some 4,086.61 acres, and consists of what has been referred to in the record as 'mud-flats,' lying to the East of the toe of the bluff of the Texas mainland and extending out into the Laguna Madre, and reflected pictorially as to shape, and by metes and bounds description, on Plaintiffs' Exhibit No. 4, which exhibit likewise reflects some of the surrounding territory, including Yucca Island and North Three Islands. The portion of the area near Yucca Island between the red lines drawn near such Island and said Island itself, and the portion of such area near North Three Islands East of the red line drawn West of said Island, all on said Plaintiffs' Exhibit No. 4, has in effect been disclaimed by the Plaintiffs, through their motion for judgment and through their testimony offered on the trial to the effect that such portions of said area represented accretions to Yucca Island and to North Three Islands, respectively, and did not represent accretions to the mainland.

"2nd. As the name 'mud-flats' suggests, the area involved is a low-lying, flat area. It is a little above actual sea level and, while not circular in form, it has a flat, saucer-like topography with the outer edges being somewhat higher than the inner portions, so that the general slope of the over-all area is from the outer edges toward the center. There are, however, several inner saucer-like depressions, located generally near the center of the area and running generally from southeast to northwest. The elevations over said mud-flats area, generally, runs from .25 feet above sea level to .80 feet above sea level, but with a few places reaching an elevation of 1.0 feet at the southeastern and northeastern perimeter, toward and near North Three Islands. West of the flats area, which is bounded on the west by the toe of the bluff of the mainland, lies the mainland bluff proper, which bluff, between the line thereof and the toe thereof, is at places an abrupt drop of several feet, while at other places such drop is of a gradual slope, the elevations along such bluff line itself running generally from one foot above sea level at some places to something over five feet above sea level at other places. These elevations, as well as the line of the toe of the bluff and that of the bluff line, are reflected on Plaintiffs'

Exhibits Nos. 4 and 5, said exhibit No. 4 reflecting the elevation contour lines of the flats area and the line of the toe of the bluff, while said exhibit No. 5 reflects points of elevation over the flats area as well as up to the bluff line but without contour lines appearing thereon.

"3rd. Said mud-flats area is about 10 or 15 miles distance North or Northwest of Port Isabel (Point Isabel), Texas, and, as above noted, such area begins at the toe of the bluff of the Texas mainland, at which point or line there is an abrupt and visible change in the looks and appearance of the terrain from that of the mainland, and running eastward from the toe of the mainland bluff such terrain is of a very flat and shore-like appearance, like a beach, with the soil itself being of a sandy clay-like formation, and at the outer perimeter on the East there being another narrow beach-like edging, which latter is visible at times when the water is not over the same.

"4th. To the North of said mud-flats area is Horse Island, which up to at least about 1915 was cut off from the mainland, and in 1915 had a bridge or tressel connecting it with the mainland, which bridge or tressel was of some 40 to 50 or more feet long, with a dirt fill at each end thereof, the total length being about 150 feet. Up to such time, the waters of the Laguna Madre were between said Island and the mainland. Sometime between 1924 and 1933 or 1934, the exact date not being established, a dirt dump or fill was thrown up by dragline across this separating space between Horse Island and the mainland, so that since that time said Island has been connected to the mainland by such solid dirt dump or fill, which in effect constitutes a connecting dam, across which travel may pass, but as a result of which the waters of Laguna Madre at such point have been blocked from flowing or passing between said Island and the mainland. Since this condition has existed, it has been observed on occasion that the waters of the Laguna Madre will be present on the flats North of and adjoining said dam or fill when none is present on the mud-flats area to the South of such dam or fill, the water being blocked from flowing to the South between the Island and the mainland by such dam or fill, as they would have done but for such fill.

"5th. To the Southeast of Horse Island and at the outer perimeter of the mud-flats area, East of the general Northwest central portion of said area, lies Yucca Island, and further to the South and on the extreme East of the mud-flats area, lies North Three Islands.

"6th. From the mainland bluff across the mud-flats to North Three Islands is approximately two and three-fourths miles distance. From the mainland across such flats to Yucca Island is approximately one-half mile distance. From the North to the South portions of said flats area is approximately three miles distance.

"7th. Padre Island, which runs generally North and South off the Texas coast for approximately 100 miles from Port Isabel to Corpus Christi, is located approximately four miles to the East of said mud-flats area, with the waters of Laguna Madre in between, and to the East of Padre Island is the Gulf of Mexico, which has passes or openings into the Laguna Madre at the Northern and Southern ends of said Padre Island. The pass or opening at the South end of Padre Island is known as and called Brazos-Santiago Pass, which lies about opposite Port Isabel, although somewhat further to the South. This pass is approximately 1200 feet in width, with a deepend ship-channel near the center of approximately 300 feet in width.

"8th. The elevations on the Islands above mentioned reach several feet above sea level, and the islands are flanked by small sandy beaches, above which grass and other vegetation grows. Likewise, on the mainland, from the bluff line back, grass and vegetation grows and some farming is accomplished, and occasionally on the slopes of the mainland bluff, between the bluff line and the toe of the bluff, some vegetation is occasionally found. On the mud-flats area, however, from the toe of the mainland bluff eastward, no vegetation whatever grows, and such flats are perfectly bare, except for an algae formation which forms a thin 'mat' upon said flats. This algae is some low order of vegetation, without roots, and same will not grow in fresh water and, in order to live, must occasionally be covered with salt water.

"9th. In the area of the mud-flats in controversy there is no appreciable daily rise and fall of the astronomical tide, as such, in the Laguna Madre, and said mud-flats are not daily covered and uncovered by the water of the laguna. This is not to say, however, that the waters of the Laguna Madre remain at comparatively constant levels under normal conditions existing in the locality, for such is not the case. Extremely strong currents exist in these waters, sufficient in strength or velocity to cause the large buoys therein along the Intracoastal Canal to lean with such currents, even in the face of strong winds from the opposite direction. These currents apparently are set up as a result of a combination of natural forces, including the tides, the winds in the locality, barometric pressure, the surge of the waters from the Gulf of Mexico through Brazos-Santiago Pass into and out of Laguna Madre, and possibly other elements such as the deepening of the ship channel through said Pass and the digging of the Intracoastal Canal through the Laguna Madre from Port Isabel Northward,—which said Canal passes just to the East of North Three Islands at a distance of approximately 500 yards from the East side of said Island, and at a distance of approximately 1000 to 1500 yards to the East of the mud-flats at the location just North and just South of said Island, such distance increasing gradually as the Canal goes North and South from North Three Islands in either direction. (See Defendant's Exhibit No. 2 for location of Intracoastal Canal in this connection). Regardless, however, of the causes of such currents referred to above, the same do exist in and through said Laguna Madre, and regardless of the fact that the water level of said Laguna may not be greatly raised or lowered daily by the astronomical tide, as such, in the locality involved, such water level of the waters of the Laguna Madre do not, as has already been above stated, remain normally at constant levels, but on the contrary, under normal conditions in the locality, said water levels are changing frequently and often, and these changes have been marked and observed both through observations and readings taken along the Intracoastal Canal as well as through the tide gauge readings or recordings at the tide gauges at Port Isabel to the South of the mud-flats and at Port Mansfield to the North of said flats.

"10th. In this locality here involved, there are strong prevailing winds during most of the year, the same blowing, as a rule, about two-thirds of the time from the South and Southeast, and the balance of the time from the North and Northeast, with occasional shifts or changes from other directions. Northers blow at intervals from about September to March or April. These wind conditions are normal for the locality, and can be and are expected, and such conditions represent the usual and normal and cus-

tomary condition in the particular locality as distinguished from special and unusual situations.

"11th. The Intracoastal Canal, hereinabove referred to in these findings, or at least the portion thereof in this locality, was started in construction about 1945 or 1946 and was completed about 1949. As above pointed out, said Canal passes to the East of and near North Three Islands and the Eastern portion of the mud-flats area. Starting to the North of Port Isabel and running on up to the North of the mud-flats area involved, on the West side of said Canal, between said Canal and the Mud-flats area, the spoil banks or dumps from the digging of said Canal were thrown out into Laguna Madre, such dumps or banks being composed of the material dug from the bottom of the Laguna Madre in digging or dredging such canal. These dumps or mounds run in a broken line or chain along the West side of said Canal, with openings at irregular intervals through which the waters of the Laguna Madre pass back and forth, and about the feet of which banks or dumps such waters wash constantly, and while, as stated, the water may pass through the openings at such intervals, it is apparent that such chain of dumps offers an obstruction to free passage of the water in the bay from East to West and from West to East at the line of said dumps.

"12th. To the North and Northwest of the mud-flats and of Horse Island, runs the Harlingen Ship Channel, which Channel runs out from the Arroyo Colorado at the mainland into and through Laguna Madre to a point where it joins and connects with the Intracoastal Canal at such location. This ship channel is approximately 1000 yards to the North of Horse Island and approximately 5000 yards to the North of the mud-flats at the Northern portion thereof. This ship channel was constructed prior to 1949, (the same being reflected on Defendant's Exhibit No. 2) but the exact date not being presently recalled, it being believed by the Court that the same was dug sometime between 1940 and 1949. It is possible that the record may not reflect the exact date. In any event, it was prior to 1949. Along this channel another broken chain of spoil banks or dumps has been thrown up in the digging of said channel, similar to those along the Intracoastal Canal above mentioned, except that this latter chain of dumps runs from East to West, generally speaking, while those along the Intracoastal Canal run generally North and South.

"The effect of the spoil banks, above referred to, together with the dump or fill from Horse Island to the mainland, above mentioned, tends to fence in the area between the mainland and such banks or dumps and to impede the free access of water to and from said area, which includes the mud-flats here involved.

"13th. While, as hereinabove found, the mud-flats in controversy are not daily covered and uncovered by the sea water of Laguna Madre; nevertheless by virtue of the natural forces operating upon said waters in the general vicinity, waves are created in and upon said waters, and the water level rises and falls from time to time throughout the year, so that such waters of the Laguna Madre do repeatedly, from time to time, throughout the year, including the winter months, roll in and upon and over the mud-flats area in controversy, so that in varying degrees said flats are from time to time, at such periods, covered with sea water; sometimes the entire flats being covered with visible waves running over the flooded area, while at other times only portions of said flats may be covered with water,—the degree of inundation depending upon the various natural conditions existing at the partic-

366

ular time, such as the condition of the tide in the Gulf of Mexico, the force and direction of the wind, the currents within the bay, astronomic forces, barometric pressures, etc.,—strong winds from the North or Northeast, or from the South or Southeast causing such waters to repeatedly, throughout the year, and during every season of the year, to roll over and upon such flats, in varying degrees, as aforesaid. In this connection, it is apparent that it is impractical, if not absolutely impossible, to measure the effect of the astronomic tide upon the height or level of the waters of Laguna Madre, separate and apart from other natural forces operating at the same time. The inundations of the flats must be accompanied by a high tide in the Gulf of Mexico, but such inundations need not be accompanied by storm tides and they occur in the absence of storm, hurricane or other unusual condition or occurrence, such flats being inundated in such varying degrees under the normal and customary conditions existing in this locality, apparently as a result of the inextricable intermingling of the various and sundry forces of nature, including those forces and elements hereinabove mentioned in this paragraph. If there is any known way or means of apportioning the effect of these various natural forces, so that a rise in the level of the waters of the Laguna Madre can be separately apportioned between each of such forces, such means has not been pointed out to the Court, and the Court does not know of any such means.

"On such occasions of the inundations of the flats, as hereinabove referred to, such flats are scattered with sea drift of various kinds, such as sea grass, planks, boards, pumice, sea beans, shells, fishing corks, light bulbs and other articles usually found along seashores, such drift of one kind or another having been found at various portions of practically the entire flats up to the very toe of the mainland bluff. Also, banks of sea grass tend to pile up at the outer edges of the flats and islands, later to be left to dry and rot. At such times, water may remain upon the flats in varying degrees, anywhere from one to ten days, in varying depths, the acreage covered and the depth to which same may be covered depending upon the direction and the force of the wind, the height of the tide in the Gulf of Mexico and the force and effect of the other natural forces then existing and operating in connection with said water, and hereinabove referred to.

"When the water recedes, small fish are sometimes left stranded in the depressions, and, if dry weather prevails, the flats tend to dry out, the algae 'mat' dries and cracks and curls in the sun and blows with the wind, and the surface of the flats cracks open in places, and, while most of the flats area never becomes entirely dry, but remains damp, such flats may become sufficiently dry so that a person may walk thereon without mud sticking to the shoes, and jeeps and caterpillar tractors may be driven across the same. Salt is left deposited upon the flats and glistens in the sun and hurts the eyes, and salt crusts form in and around foot marks depressed in the surface where stock may have wandered.

"14th. The evidence offered on the trial does not reflect the actual number of times during any year that the mud-flats have actually been observed to have been inundated with sea water, apparently no daily observations having been made by any person to ascertain such specific information, or at least such not appearing in the evidence. However, it does appear that the witness Woodrow W. Sanson has on occasions seen water over the entire flats area, while working nearby, and has seen a shallow-draft boat cross

such flats when so inundated, and that Dr. Lohse, a witness for the Plaintiffs, beginning December 17th, 1952, and running through January 23rd, 1955, made observations at such mud-flats on 64 separate days during such period mentioned, as reflected by the testimony of said witness and as reflected by Defendant's Exhibit No. 10. These observations were made during the years and months set out in the tabulation next below, and such tabulation likewise sets out the number of days in such months and the number of days in the respective years that such observations were made, such facts, as so tabulated being as follows, to-wit:

"Dr. Lohse's 64 Days of Observation

| Year | Month | No. Days in Month | No. Days in Year |
|------|-------|-------------------|------------------|
| 1952 | December | 1 | 1 in 1952 |
| 1953 | January | 2 | |
| | February | 1 | |
| | September | 7 | |
| | October | 4 | |
| | November | 3 | |
| | December | 2 | 19 in 1953 |
| 1954 | January | 15 | |
| | February | 1 | |
| | March | 3 | |
| | May | 3 | |
| | July | 5 | |
| | August | 4 | |
| | September | 10 | |
| | October | 1 | |
| | November | 1 | 43 in 1954 |
| 1955 | January | 1 | 1 in 1955 |

"It is not made to appear in the evidence the exact amount of water that was on the mud-flats on each of the occasions when water was on the same during these observations, However,—

"(1) Of the 19 separate days when observations were made in 1953, water was present on the flats on 8 of such days, which same occurred during the months of September, November and December.

"(2) Of the 43 separate days when observations were made in 1954, water was present on the flats on 24 of such days, which same occurred during January, February, March, May, July, September and October.

"(3) As to May 1954 observations, water was on the flats when the witness arrived on May 16th, but it does not appear how long such water had been there in the previous days.

"(4) In the two-year period of observations made in 1953 and 1954, above reflected, water has actually been observed on the mud-flats at one time or another, in every month, except the months of April, June and August, during 62 days of observation, with no observations in such period being made in the months of April and June, and only four made in August.

"15th. In the Laguna Madre no tide gauge has been set up at the immediate location of the mud-flats in controversy. However tide gauges are located at Port Isabel and at Port Mansfield (the latter being sometimes referred to as the 'Humble Gauge' and sometimes as the 'Red Fish Landing Gauge'.) In these findings, the Gauge at Port Mansfield will be referred to as the 'Humble Gauge.' The mud-flats area in controversy lies approximately midway in Laguna Madre between the Port Isabel Gauge and the Humble Gauge. Tide readings on these two gauges mentioned, reflecting highest tides in the Laguna Madre above sea level (figured or based on the same datum plane used to figure the elevations above sea level on the mud-flats area, as reflected on Plaintiffs' Exhibits 4 and 5, so that the elevations or marks of such highest tides on such gauges are coordinated with and correspond with the elevations on such mud-flats) registered at these respective gauges, for corresponding periods, are set out below in this paragraph in tabulated form. The Humble Gauge only operated for about three and one-half years, and hence readings on that gauge are only reflected from June 1947 to June 1950, while the Port Isabel Gauge, which has been in operation since April 1944, reflects readings from 1944 to 1954. A tabulation of the high-

est tide reading at the respective gauges mentioned, together with a mean or average between the same, the period covered, and the particular date, are as follows:

### "I.

#### Highest Annual Tide Reading

| (A) At Humble Gauge | Feet Above Sea Level | Date |
|---|---|---|
| 1947 | 2.28 | June 28, 1947 |
| 1948 | 2.35 | May 3, 1948 |
| 1949 | 2.19 | May 22, 1949 |
| 1950 (six months) | 2.13 | March 27, 1950 |
| Average | 2.24 | |

(B) At Port Isabel Gauge:

| Year | Feet Above Sea Level | Date |
|---|---|---|
| 1944 | 2.31 | May 28; Sep. 27, 28. |
| 1945 | 3.41 | August 26th |
| 1946 | 2.71 | October 1st |
| 1947 | 2.51 | November 18th |
| 1948 | 2.51 | November 18th |
| 1949 | 2.81 | October 3rd |
| 1950 (Gauge out in Oct. & 1st 7 days Nov.) | 2.61 | April 17th |
| 1951 | 2.31 | Jan. 6 & 10 and Oct. 18th |
| 1952 | 2.61 | Sept. 11th |
| 1953 | 2.91 | Oct. 24th |
| 1954 (Jan. thru Aug.) | 2.31 | May 3rd |
| Average | 2.64 | |

### "II.

#### Highest Tide of Year During December, January and February.

(A) At Humble Gauge:

| Year | Feet Above Sea Level | Date |
|---|---|---|
| 1947–1948 | 1.75 | Dec. 8, 1947 |
| 1948–1949 | .94 | Feb. 15, 1949 |
| 1949–1950 | 1.99 | Jan. 26, 1950 |
| Average | 1.56 | |

(B) At Port Isabel Gauge:

| Year | Feet Above Sea Level | Date |
|---|---|---|
| 1944–1945 | 1.81 | Dec. 5, 1944 |
| 1945–1946 | 1.71 | Dec. 18, 1945 |
| 1946–1947 | 2.01 | Dec. 1st and 10th, 1946 |
| 1947–1948 | 2.21 | Dec. 10th, 11th & 12th, 1947 |
| 1948–1949 (gauge out from Dec. 2nd—no reading) | | |
| 1949–1950 | 2.21 | Feb. 13, 1950 |
| 1950–1951 | 2.31 | Jan. 6, 1951 |
| 1951–1952 | 2.21 | Dec. 14, 1951 |
| 1952–1953 | 1.81 | Feb. 20, 1953 |
| 1953–1954 | 2.01 | Dec. 19, 1953 |
| Average | .2.03 | |

### "III.

#### Highest Winter Tide, December 22nd Through March 21st.

(A) At Humble Gauge:

| Year | Feet Above Sea Level | Date |
|---|---|---|
| 1947–1948 | 1.83 | March 22, 1958 |
| | (next highest 1.75 | ) |
| 1948–1949 | .94 | Feb. 15, 1949 |
| 1949–1950 | 1.99 | Jan. 26, 1950 |
| Average | 1.59 | |

(A) At Port Isabel Gauge:

| Year | Feet Above Sea Level | Date |
|---|---|---|
| 1944–1945 | 1.41 | Jan. 22 & Feb. 21, 1945 |
| 1945–1946 | 1.71 | Jan. 14 and Feb. 9, 1946 |
| 1946–1947 | 1.61 | March 1, 1947 |
| 1947–1948 | 1.91 | Jan. 13, 1948 |
| 1948–1949 (gauge out) | | |
| 1949–1950 | 2.21 | Feb. 13, 1950 |
| 1950–1951 | 2.31 | Jan. 6, 1951 |
| 1951–1952 | 2.01 | Jan. 24th & Feb. 23rd, 1952 |
| 1952–1953 | 1.81 | Feb. 20, 1953 |
| 1953–1954 | 1.51 | Jan. 14 & Feb. 23, 1954 |
| Average | 1.83 | |

"16th. No tide gauge readings at the actual flats area involved are available, no gauges being there located as above pointed out, but as said flats area is located approximately half way between the Port Isabel Gauge and the Humble Gauge, a mean between the readings of the two gauges mentioned should give a reasonably correct reading for the tide level at the mud-flats area in Laguna Madre. On this basis, taking the 'average' set out under each subdivision appearing above under Finding of Fact number '15th', the elevation of the tide level at said flats is as follows:

"(1) Average of highest annual tides......2.44 feet

"(2) Average highest tide of year during December, January and February......1.79 feet

"(3) Average of highest winter tides, Dec.

"22nd through March 21st....1.71 feet and since the highest elevation

shown on the flats area is 1.0 feet, the average of any of such three theories of highest tides is more than sufficient to inundate the said flats area. In fact, the mean between the reading on the .Port Isabel Gauge and the Humble Gauge is in excess of 1.0 feet in each and every instance of the highest tide. readings so referred to under finding '15' with the single exception of the February 15, 1949 readings of .94 feet, and even this would exceed the elevation of all portions of the flats area involved, except a very narrow margin at the extreme Northeast and Southeast perimeter of such flats.

"17th. The flats area involved have not become a part of the original lands covered by the Spanish Grant under which Plaintiffs claim, and have not become a part of the mainland of Texas, by accretion or reliction, or otherwise, and such flats area is not fast land, but on the contrary said area remains and is a part of the bed and shores of the Laguna Madre.

"18th. No doubt some portion of the build-up of the flats area, through the many, many years has come from material brought into the Laguna Madre from the mainland, from the Resaca de Los Cuates, as well as elsewhere along the immediate vicinity of the coastline. On the other hand, the physical facts are such that it is apparent, and is here found, that much of the build-up of such flats through the years has come from other sources such as from the nearby islands of Yucca, North Three Islands and Horse Island, materials coming from the sea, itself, such as sea grass and material churned from the bottom of the Laguna Madre and deposited through the water's actions. Also the spoil banks in the immediate vicinity thrown out along the artificial canals dug through the Laguna Madre, and hereinabove referred to, inevitably have contributed material deposited upon the flats in question, carried there by the currents of the waters which wash constantly through and about the bases of such spoil dumps, and by the winds. Also, while the extent thereof cannot be from the evidence offered in this case measured, the throwing up of the dirt dump between the mainland and Horse Island has blocked the flow of the water between said Island and the mainland so that waters on the flats to the South of Horse Island are left in a sort of pen at such point, with the natural increased tendency to drop its deposits along such vicinity. Some of these factors have tended to build the flats area upward from the bed of the Laguna; some have tended to build outward from the Islands and some outward from the mainland. The net result has not created fast land to this date.

"However, if the court should be mistaken as to its conclusions as hereinabove stated with reference to such buildup of such flats, and even, if such flats should be found to be fast land and to represent accretions to the mainland and to the Islands at the present time, still, if such be the case, it is not possible to reasonably apportion such accretions between the mainland and such islands, and especially so in view of the unmeasured, but nevertheless present, contributing factors resulting from the various artificial changes or structures made and constructed in the immediate vicinity, and hereinabove mentioned and referred to."

The court then filed conclusions of law:

"1st. The Civil Law, as the same existed in the State of Tamaulipas, Mexico, at the time of the said Buena Vista Grant of land involved in this suit in 1829, and being the law of Las Siete Partidas, governs and determines the rights of the parties in connection with the mud-flats area involved in this suit.

"2nd. The Spanish law and the Partidas were taken from the Institutes of Justinian and the ancient Roman Law, and were in effect in Tamaulipas when the Grant of land in-involved was made in 1829.

"3rd. Under the laws so in effect in the State of Tamaulipas, Mexico at the time of such Grant of land in 1829, the seashore was defined to be:

"'all that ground is designated the shore of the sea which is covered with water of the latter (the sea) during the whole year, whether in winter or in summer.'

and this definition was adopted by the Supreme Court of Texas in the case of State v. Balli [144 Tex. 195], 190 S.W.2d 71, decided in 1944.

"4th. Under the Civil law and such definition, the boundary between the sovereign owner of the sea and its shores and the privately owned up-land is that point or line reached by the year's highest wave (during normal weather conditions—not during severe storms or hurricanes), without regard to what time of the year the wave occurred and without regard to whether the wave was wind-driven or brought in by other forces of nature operating under normal conditions.

"5th. In view of the fact, as here-inabove found, that the readings of the tide gauge staffs show an average high over a period of years for the year's highest wave of 2.24 feet and 2.64 feet, respectively, which is (and the mean between which is) sufficient to cover all of the mud-flats area in controversy, and in view of the further fact that the sea waters of the Laguna Madre do in fact from time to time throughout the year cover all of the land in controversy, as hereinabove found, I find and conclude that the plaintiffs have failed to prove that the sea has abandoned such area.

"6th. I further conclude and find that some of the earlier Texas deci-sions fixed the boundary line between the sea and the upland at the line of the 'highest tide in winter,' and that these decisions used such language in the sense of winter's highest wave (though not the highest crest of storm-driven sea water) and not in the sense of an astronomic tide. However, even if the rule of 'highest tide in winter' applied, in view of the fact, as hereinabove found, that the mud-flats area in controversy is covered by sea water from time to time in the winter, and as is also shown by the records of the tide staffs, I conclude and find that the area in controversy would still be a part of the bed and shore of the Laguna Madre, and not fast land.

"7th. The burden was upon the plaintiffs in this suit to prove that the State had been divested of the area in controversy, and the plaintiffs have not met such burden.

"8th. The build-up of the flats area has been in great part from the bed up and not from the mainland out, with a substantial portion of such build-up of such area having resulted from the throwing up of the spoil banks of the artificial channels to the North and the East of such area and the subsequent washing away and blowing away of said banks and the deposit of such material on the flats area, and such buildup does not represent accretions to the mainland.

"9th. If I be in error in my conclusion that such build-up does not represent accretions, and if it should be held that same do represent fast land as accretions, I conclude and find that it would be impossible to ascertain what portion of the accretion is the result of such artificial means and what portion is the result of natural causes, and that it would likewise be impossible to apportion, as a practical matter, the accretions between the mainland and the offshore islands.

"10th. The decision of the Supreme Court of Texas in the case of State v. Balli [144 Tex. 195], 190 S.W.2d 71 is not *stare decisis* that the line of highest tide in winter and the line of mean high tide is substantially the same on all of the shores touched by the Laguna Madre, and hence at the mud-flats area in question, and hence that the shoreline in question must be located at the line of mean high water,—such decision merely holding that in the absence of evidence as to the line of high winter tide on Padre Island by any survey, that the evidence reflected in the record in that case would on appeal support an *implied* finding by the trial court, in support of the judgment rendered by such court that there was no substantial difference between such lines as applied to the island there involved."

"11th. The ownership of the mud-flats area is in the defendant, the State of Texas, and such defendant is and was entitled to the judgment rendered in its favor in this suit so adjudging."

Appellants filed many exceptions to the findings of fact and conclusions of law and asked for amended and additional findings of fact, and thereafter the court filed his amended findings of fact, wherein some of the exceptions were overruled and some were granted in part, and we quote the amended findings substantially verbatim on those findings that were amended in any respect:

"8. Plaintiffs' Exception No. 8 is overruled, However, in case the last paragraph of the original finding of fact No. 12 might not be absolutely clear in regard to the references therein referred to, said last paragraph of said original finding No. 12 is hereby amended so as to read as follows:

" 'The effect of the said chain of spoil banks along the Harlingen Ship Channel, together with the said dump or fill from Horse Island to the mainland, together with the said chain of spoil banks along the Intracoastal Canal, tends to fence in the area between the mainland and said banks or dumps and to impede the free access of water to and from such area, which includes the mud flats here involved.' * * *

"16. In connection with Plaintiffs' Exception No. 16, No. 17 and No. 18, while Dr. Lohse did at one point in his testimony state that he had made 64 days of observations on the flats, and at other points in his testimony stated that he had made 65 days of observations, the tabulation made by him and set out in Defendant's Exhibit No. 10 does in fact show 66 days of observation instead of 64 days, and shows 17 days of observation in January 1954, instead of 15 days observation in such month; accordingly the tabulation of such observations so made by Dr. Lohse and set out in the Court's original findings of fact under finding 14th is hereby amended in the following respects:

"(a) The caption to such tabulation is here amended so that the same shall read: 'Dr. Lohse's 66 Days of Observation.'

"(b) The 8th line in such tabulation, reading '1954 ——— January ——— 15' is hereby amended so that the same shall read: '1954 ——— January ——— 17' so as to reflect 17 days of observation made in January 1954 instead of 15 days of observation as originally tabulated.

"(c) The next to the last line in said tabulation covering the year 1954, reading: '——— November ——— 1 ——— 43 in 1954' is hereby amended so as to read: '——— November ——— 1 ——— 45 days in 1954' so as to reflect 45 days of observation made in 1954 instead of 43 days as originally written.

"(d) In the next paragraph following the tabulation set out in original

finding 14, in subdivision numbered '(2)' the beginning of such subdivision reading: 'Of the 43 separate days in * * *,' such quoted portion of said subdivision '(2)' is hereby changed and amended by changing the figure '43' to '45' so that such beginning of said numbered subdivision shall read: 'Of the 45 separate days * * *' so as to reflect 45 days of observation in 1954 instead of 43 days of observations as originally written; otherwise, such subdivision '(2)' to remain as originally written.

"(c) In subdivision '(4)' of said paragraph following the tabulation in finding No. 14 the phrase 'during 62 days of observation' is hereby amended to, read 'during 64 days of observation;' but otherwise said subdivision '(4)' to remain as.originally written.

"17. In connection with Plaintiffs' Exception No. 19, subdivision '(3)', in the paragraph following the tabulation in finding of fact number 14, referring to the May 1954 observations, is hereby amended so that the same shall read as follows:

"'(3) As to the May 1954 observations, water was on the flats when the witness arrived on May 16th, but it does not appear how long such water had been there prior to the arrival of such witness on May 16th.'"

"18. Plaintiffs' Exception No. 20 is overruled. In this connection, however, it is here pointed out and found by the Court that the witness Carr testified that in connection with the tide gauge readings involved that the correction in connection with the Galveston primary gauge would be negligible and the Court therefore has concluded and here finds that the tabulated readings of the Humble and Port Isabel gauges reflected in the original finding of fact No. 15 are substantially correct. Likewise, the witness Carr testified that the tide gauge readings as given by him had been oriented to the elevations reflected on the maps showing the elevations on the mud-flats area in controversy. * * *"

Rulings and Action of the Court on Plaintiffs' Request for Corrected or Amended and Additional Findings of Fact.

* * * * * *

"1. The Potrero de Buena Vista Grant was originally granted by the State of Tamaulipas, Republic of Mexico, a former sovereign, to Manuel de la Garza Sosa by proceedings begun September 1, 1827, and completed January 24, 1829, through an Act of Judicial Possession under the laws then in effect.

"2. At the time of the grant to Manuel de la Garza Sosa by the State of Tamaulipas, the Potrero de Buena Vista was a riparian grant fronting on the Laguna Madre.

"3. The eastern boundary of the Potrero de Buena Vista Grant at the time it was titled to Manuel de la Garza Sosa was Laguna Madre.

"4. The grant by the State of Tamaulipas, Republic of Mexico, to Manuel de la Garza Sosa was duly recognized and confirmed by an Act of the Legislature of Texas approved February 10, 1852, entitled 'An Act to Relinquish the Right of the State to Certain Lands Therein Named,' being Confirmation No. 38 in said Act to Manuel de la Garza Sosa of 'six and a fraction leagues,' called 'Buena Vista'. (c G.L. of Texas, Page 941 et seq.)

"5. Through mesne conveyances and a regular chain of title from and under Manuel de la Garza Sosa, the plaintiff, J. W. Luttes, holds title to all of the Potrero de Buena Vista Grant which is material to a determination of the issues in this suit subject only to an oil and gas lease in favor of the plaintiff, Shell Oil Company.

"6. The plaintiff, Shell Oil Company, holds an oil and gas lease from J. W. Luttes covering all of the Potrero de Buena Vista Grant which is

material to a determination of the issues in this suit.

\*　　\*　　\*　　\*　　\*　　\*

"17. In response to Plaintiffs' Requested Finding No. 17 the Court here finds as follows:

"When Padre Island was formed, it created a lagoon between the island and the mainland. This lagoon is now called Laguna Madre. \* \* \*

"21. Plaintiffs' Requested Finding No. 21 is denied, the same representing merely evidentiary matter and not representing any ultimate fact issue. In addition, such finding is misleading in that the evidence does not show that the Resaca de los Cuates is at present a flowing stream and in that the evidence shows that for many years flood waters from the Rio Grande River have been protected or confined on the Texas side of such river by the flood control system of levees erected and constructed along the Texas side of such river.

"22. Plaintiffs' Requested Finding of Fact No. 22 is denied, the same representing merely evidentiary matter and not representing any ultimate fact issue, although it is here found that such waters as come from the Resaca de los Cuates into the Laguna Madre do carry sediments therein.

"23. In response to Plaintiffs' Requested Finding of Fact No. 23, while the Court is of the opinion that such finding is covered in the original findings of fact under the heading 'Preliminary Statement and Nature of the Suit,' the court nevertheless here finds that in 1829 the waters of the Laguna Madre completely covered the lands in controversy at the time of the original Mexican grant involved in this suit, or at least if not completely covered at all times, such area was a part of the bed or shores of the Laguna Madre.

"24. In regard to Plaintiffs' Requested Finding No. 24, same is denied and has been covered in the Court's

original findings of fact in the third paragraph under the designation 'Preliminary Statement and Nature of Suit.' Furthermore, the Court has not been informed as to the specific elevations along the 'foot of the bluff' in 1829 and in addition the requested finding insofar as ultimate fact issue is concerned is covered by the additional finding of fact No. 2 hereinabove set out.

\*　　\*　　\*　　\*　　\*　　\*

"26. The court refuses Plaintiffs' Requested Finding of Fact No. 26 the same representing merely evidentiary matter and not representing any ultimate fact issue. In addition, as has already been found by the Court in its findings of fact, the waters of the Laguna Madre do not remain 'still waters.' However, it is perfectly apparent and the Court does find that such sediment in the waters as are carried into the Laguna Madre from the Resaca de los Cuates are precipitated out, in large part, upon entering the Laguna Madre.

"27. The Court refuses Plaintiffs' Requested Finding of Fact No. 27 in that the findings of the Court in this connection have been reflected under the Court's original finding of fact No. 18. Furthermore, as indicated in the Court's original finding of fact, the Court is not of the opinion that all of the build up in connection with the mud flats in controversy occurred between 1829 and 1930.

"28. The Court denies Plaintiffs' Requested Finding of Fact No. 28 in that the Court's findings in this connection have been reflected in the court's original findings of fact No. 18 and for the additional reason that the Court is not of the opinion that all of the lands in controversy were formed from sediments precipitated by the Resaca de los Cuates.

"29. The Court refuses Plaintiffs' Requested Finding of Fact No. 29 as the court findings in this connection

have already been made under the original Finding No. 18 and for the further reason that the court has already found that the build up of the mud-flats area in controversy has not been merely through deposits coming from the Resaca de los Cuates but that such build up has resulted from various and sundry causes as referred to in the Court's original findings of fact in this cause. * * *

"35. In connection with Plaintiffs' Requested Finding of Fact No. 35, the Court has already found in its original Finding of Fact No. 2 and here repeats that the elevations upon the mud-flats area were reflected on Plaintiffs' exhibits No. 4 and No. 5, with the qualifications referred to in said finding No. 2. In this connection, however, the elevations shown on plaintiffs' exhibit 5 as already pointed out in the court's original finding of fact reflect the elevations of the bluff line itself as distinguished from the elevations at the toe of the bluff reflected on plaintiffs' exhibit No. 4 as set out and referred to in the court's original finding of fact No. 2. Plaintiffs' Exhibit 4–A is substantially the same as Plaintiffs' Exhibit 4 in this respect, and would likewise reflect the elevations.

"36. Plaintiffs' Requested Finding of Fact No. 36 is refused for the reason that the Court's finding in connection with this matter is reflected in the Court's original finding of fact No. 2 and for the further reason and additional reason that it is not a fact that the entire eastern boundary of the mud-flats area in controversy is one foot or more above mean sea level, but in truth and in fact, as referred to in the court's original finding of fact No. 2, a portion of the eastern boundary of the mud-flats area adjoining North Three Island reaches one foot above mean sea level but the remainder of the eastern boundary of said area running between North Three Islands·and Yucca Island and constituting about two-thirds of

the distance between North Three Island and Yucca Island on the eastern boundary does not reach an elevation in excess of .80 feet above mean sea level, and none of the eastern boundary of the mud-flats area is in excess of one foot as reflected on Plaintiffs' Exhibit No. 4. In this connection, while the Court's original finding of fact No. 2 the words 'sea level' were used and not the words 'mean sea level,' it was intended by the term sea level as used in the original findings to mean mean sea level. * * *

"38. In response to Plaintiffs' Requested Finding of Fact No. 38 the court here finds that:

"Mean high water in Laguna Madre as determined from two automatic gauges is as follows: Port Mansfield gauge: 0.416 feet above mean sea level. Port Isabel gauge: 0.560 feet above mean sea level. * * *

"Plaintiffs' Requested Finding of Fact No. 45 is refused as same does not correctly state the facts, some portions of the flats area in controversy being below the line of mean high water as determined from the Port Isabel and Port Mansfield automatic gauges. Likewise, the Court's findings in this regard have already been set out in the court's original findings of fact and in the above and additional finding No. 35. * * *"

Appellants assail the judgment of the trial court on six points. They are substantially to the effect that the court erred (1) in failing to find from the overwhelming preponderance of the credible evidence that the area of 3,365.52 acres of land described by metes and bounds in plaintiffs'' motion for judgment, and for which plaintiffs prayed judgment, is fast land, which has been added as an accretion to the open face of Potrero de Buena Vista on Laguna Madre by imperceptible deposit of alluvion from the waters of Resaca de los Cuates and Laguna Madre over a long period of time; (2) in finding that the line of demarcation between the seashore and the

upland is, in Laguna Madre, the line of highest tide in winter, instead of the line of mean high tide; (3) in failing to find that there is no appreciable astronomical or periodic tide in that portion of Laguna Madre where its shores are contiguous to the land involved in this suit; (4) in holding that occasional wind-blown waters are to be considered as tides, and that lands inundated on irregular occasions by waters blown from the sea is "covered with water of the latter during the whole year, whether in winter or summer."; (5) in failing to find from the overwhelming preponderance of the credible evidence that in Laguna Madre the line of mean high tide and the line of highest tide in winter are substantially the same; (6) in concluding that the decision of the Supreme Court of Texas in State v. Balli, 144 Tex. 195, 190 S.W.2d 71, is not stare decisis of the proposition that in Laguna Madre the line of highest tide in winter and the line of mean high tide are substantially the same.

Appellee's counter points are substantially: (1) the disputed area is not fast land added to the Buena Vista grant by accretion; (2) the seashore line of this Mexican grant is fixed by the year's highest wave under normal weather conditions, or, in the alternative, by winter's highest wave; (3) the seashore line is fixed by highest waves under normal weather conditions, regardless of whether produced by astronomic forces, or by the wind, or by other natural causes, or by a combination of same; (4) there is a substantial difference between mean high tide and highest tide, the latter term being properly used in the sense of highest wave, however caused; (5) State v. Balli is not stare decisis of the proposition that mean high tide and highest tide are substantially the same; (6) the seashore boundary of Mexican grants is governed by the Civil Law as declared in Los Siete Partidas; (7) even if the disputed area has become fast land, it is not possible to reasonably apportion such accretions between the mainland and the State owned offshore islands; and (8) even if the flats have become fast land, the buildup was largely the result of arti-

ficial means and hence does not represent accretion.

Since this cause was tried without the aid of a jury, we must approach our task in the light of certain well established rules. First of all, judgment by the trial court will not be set aside if there is any evidence of a probative nature to support it, and a Court of Civil Appeals cannot substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings. See Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972, 977; Woodward v. Ortiz, 150 Tex. 75, 237 S.W.2d 286. See also cases collated under 4 Texas Digest, Appeal and Error, Secondly, since there is expert opinion testimony tendered in this cause, our Supreme Court has consistently held that this character of testimony is but evidentiary and is never binding upon the trier of the facts, and that opinion testimony does not establish any material fact as a matter of law. Hood v. Texas Indemnity Ins. Co., 146 Tex. 522, 209 S.W.2d 345, points 1–3, at page 346. Thirdly, where the testimony of an interested witness is not contradicted by any other witness or attendant circumstances and the same is clear, direct and positive and free from contradiction, inaccuracies and circumstances tending to cast suspicion thereon, it is taken as true as a matter of law. See Cochran v. Wool Growers Central Storage Co., 140 Tex. 184, 166 S.W.2d 904, points 9–10. See also Dunlap v. Wright, Tex.Civ.App., 280 S.W. 276, point 6, at page 279, and authorities there collated; also Springfield Fire & Marine Ins. Co. v. Wm. Cameron & Co., Tex.Civ.App., 96 S.W.2d 788, points 2–3, at page 790, no writ history but cited by S.Ct.

In view of the errors assigned and the state of the record as above shown, it is our duty to examine the Statement of Facts with the foregoing rules in mind. Moreover, in our attempt to do so, we must keep in mind the statement of the rule announced by our Supreme Court in State v. Balli, 144 Tex. 195, 190 S.W.2d 71, 100, points 22–23, because under the grant

originally made it is applicable and controlling here. As we understand the rule there stated it is to the effect that the State's rights must be determined in the light of the civil law in effect at the time of the grant as it existed in the State of Tamaulipas. In the court's opinion we find the following statement of the rule:

"Any distinction that can be drawn between the alluvion of rivers and accretions cast up by the sea must arise out of the law of the seashore rather than that of accession and be based, as suggested by Dr. Rubio, upon the ancient maxim that the seashore is common property and never passes into private hands.

"The law of the seashore, like the law of accession, was originally derived in both of the great systems of jurisprudence from the Institutes of Justinian and the ancient Roman law. Thus the law of the seashore in effect in Tamaulipas when the grant in this case was made, like the law of alluvion and accretion, was that stated by Las Siete Partidas, which, as with the common law of England, differs in some details from the early Roman law. It is stated in Partidas 3, Title 28, Law 4, Scott's Translation, 1931 Edition, p. 820: 'And all that ground is designated the shore of the sea which is covered with the water of the latter at high tide, during the whole year, whether in winter or in summer.' * * *

"Thus the seashore was no part of the land, but always an adjunct of the sea. The classification of the sea and the shores of the sea as common property is as old as the oldest Roman law, but by its very nature and meaning there could never be an accession to the seashore as the seashore was defined in the law of Spain, which was effective in Tamaulipas when the grant in this case was made. *The seashore was defined to be 'all that ground is designated the shore of the sea which is covered with water of the latter during the whole year, whether in winter or in summer'.*

"Since there could be no accession to land below tidewater, any change in the tide line ipso facto changed the seashore. If the sea encroached and the upland owner lost his land, he had no redress; if alluvion formed adjoining the seashore, the latter receded with the tide line, and by the very nature of the accretion any new alluvion which formed above the tide line should become a part of the contiguous upland estate."

So, in the light of the foregoing rules stated and under the express ruling of the Supreme Court in State v. Balli, is there any evidence of probative force in this record to support the findings of fact made by the trial judge?

As we understand appellants' brief and their oral argument on submission, we think it is to the effect that since the trial court in the Balli case found against the State, and since the decision of the trial court was affirmed by the Court of Civil Appeals, and since the decision by the San Antonio Court was affirmed by our Supreme Court, that under all the credible evidence (as well as the great preponderance) tendered in the case at bar that the trial court here should have found that the land included in the survey set out by appellants in their motion for judgment should have been held by the trial court to be fast land, and the court should have awarded recovery to them for the land described in the survey, because the survey was based upon the line which the surveyors considered and found to be the line of mean high tide, and that "the finding by the Trial Court that there are substantial tides in Laguna Madre is made in the very teeth of all the evidence in this case because all the evidence shows that the periodic tide in Laguna Madre is negligible. If the periodic tide is negligible, it follows that there is no substantial difference between mean high tide, the highest tide in winter, or the highest tide for the year." We are unable to agree with the contentions

of the appellants for reasons which we shall hereafter briefly note.

First of all, from the mass of testimony and the many exhibits tendered, we cannot say what testimony is credible and what is incredible, and we have no way of knowing which part of the testimony the trial court considered credible or incredible, nor the weight he gave to the testimony of the various witnesses tendered, nor to the various exhibits introduced by the parties. What we have to consider is this great array of testimony and the specific findings made by the trial court who had the opportunity of carefully considering and weighing the testimony from day to day as he heard and considered the same, taking into consideration all of the facts and circumstances surrounding the witnesses as well as the exhibits tendered. It is true that the Balli case was tried without the aid of a jury, but there was no request for findings of fact and conclusions of law and none were filed; as in this case. In the Court of Civil Appeals' opinion we find this statement [173 S.W.2d 541]:

"No one knows the extent of the accretion with any certainty. The only definite proof as to the area of the island at the time of the grant is the de la Fuente survey. As to lands now forming part of the island but lying outside this survey, the State should recover as no rebuttal was made to its prima facie title as to such lands. * * *

"As heretofore stated, the State described the island by field notes prepared by J. S. Boyles. *The survey was based upon what Boyles considered the line of mean high tide.* The judgment of the court was to the effect that the State had no interest in and to the lands enclosed by Boyles' survey. Although no survey was made of a line purporting to be the line of high winter tide, the State contends that the grant is limited by this line under the civil law in force in Tamaulipas at the time of the grant, and consequently the State should have judgment for that land lying between the line of winter high tide and mean tide. Appellees counter with the proposition that the evidence is sufficient to support a finding that there is no substantial difference in fact between the line of high winter tide and the line actually surveyed by Boyles. *This position must be sustained. The difference, if any, is purely theoretical.* We are here dealing with an island having a perimeter of 238 miles, the sands that compose that island and the waters of the sea.

"According to Boyles, the theoretical difference in elevation between mean high tide for the whole year and mean high tide of the winter months is .09 of a foot. Boyles accepted the average low tide as established by the United States Engineering Department's data. From readings of tide gauges along the Gulf Coast from Galveston to a point near the southern end of Padre Island he calculated that mean high tide was 1.7 feet above mean low tide. By similar calculations he placed the line of high tide for the winter months at 1.79 feet above mean low tide. But it appears that the difference between mean high tide and winter high tide is greater at Galveston, a considerable distance north of the island, than it is in the immediate vicinity of the island. The difference between the elevations disclosed by the southern reading (El Moro) is only .01 of a foot. Further, Boyles testified that there was no normal tide (as distinguished from wind tide) appreciable in the Laguna Madre, and according to Boyles it is on the Laguna Madre side of the island that a slight difference in elevation between two contour lines would make a substantial difference in the areas enclosed within the lines. The particular area which would be within one line and excluded by the other is not located, and its area is stated as an estimate or guess by Boyles.

"In his testimony relating to a prior survey in the north end of the island made by Blucher, Boyles testified that

he found about 500 acres more in the superficial area (in a certain section) than Blucher had surveyed, and that there was room always for a difference of opinion between competent surveyors as to 'what line should be run and what area should be included within superficial areas and in the Laguna.' Boyles also testified that the line of survey as shown by his field notes did not exactly correspond with every slight indenture or extension of the shore, as such a course of procedure was obviously impractical.

*"From Boyles' testimony as a whole, we have concluded that, considering the methods necessarily employed in laying a line upon the ground, there is no practical difference between the line actually surveyed by Boyles and the line of high winter tide. The trial court's implied finding upon the point must be sustained."*

■ We think it is obvious from the foregoing that the factual situation in the Balli case is vastly different to the factual situation here. It is true that Mr. Boyles is a witness in the case at bar and he was tendered by the State, and that he testified in part:

"Q. Mr. Boyles, in the April-June 1954 issue of Survey and Map magazine by the American Congress on Survey and Mapping Quarterly Journal there appears an article entitled 'Surveying Tidal Land in Texas' by J. Stewart Boyles. You the author of that article? A. I am responsible for that, yes.

"Q. And in that article, at page 207, you make this statement, is this correct: 'From my personal observations, covering a good many years of actual work along the coast, there is little, if any, difference between ordinary high tide and the high storm tide in the winter.' A. I said, yes, sir, if you will take the average. * * *

"Q. You were testifying about the Laguna Madre in the Balli case, were you not, sir? A. Yes, sir, I was testifying about the Laguna Madre. Now let me answer you a little further, if I may, please. Since the Padre Island suit, I have had the advantage of four gauges, two in what we commonly call the north basin and two in the south basin, and those gauges definitely reflect that there is a tide in both the north basin and the wind basin other than the—wind tide or the wind-blown water, one of which you—your witness —used the other day, but I still maintain that I think the biggest effect is from the wind.

"Q. You are still of the same opinion then as you were then? A. Yes, sir."

Mr. Boyles did not participate in the making of the survey here before the court, and notwithstanding his outstanding reputation as a surveyor, and the general knowledge that he had of the Texas coast in this particular area by reason of the survey that he had made in the Balli case, and later observations, the trial court had the duty to consider his testimony carefully, as he did each of the other witnesses tendered, together with all of the surrounding facts and circumstances, as well as all of the exhibits admitted in evidence, and, after considering all of the evidence on the whole, to make and file his findings of fact as he found them to be. Needless to say that the findings of fact made and filed by the trial court are contra to the general view expressed by Mr. Boyles, as well as each of the statements and conclusions advanced by appellants. After a most careful consideration of this record we cannot say that there is no testimony of probative force to sustain the findings of the trial court, nor can we hold as a matter of law that the method employed by the surveyors in laying the line upon the ground which they considered to be the line of mean high tide for their survey tendered in their motion for judgment is without any practical difference from the line of high winter tide. But appellants in their brief say:

"The tide gauges show the periodic tide in Laguna Madre to be negligible,

the State's own expert witness, Boyles, testified that from many years' observations he determined that there was little difference along the Gulf Coast between ordinary high tide and the high storm tide in the winter and the United States Government has found that the periodic tide in Laguna Madre is negligible. It is submitted that the overwhelming weight and great preponderance of the evidence in this case shows that in Laguna Madre the periodic tide is negligible and that there is no substantial difference between the line of ordinary or mean high tide and the lines of highest tide in winter and highest tide for the year."

We think the foregoing conclusion of appellants is contra to the findings of fact made by the trial court. Since the trial court found that appellants failed to carry their burden in this behalf, it is our view that, considering the testimony on the whole, we should not set aside the findings of the trial court. Needless to say, if the findings of the trial court are supported by probative evidence, his conclusions of law must be sustained.

Again in appellants' brief we find this statement:

"State v. Balli, 144 Tex. 195, 190 S.W.2d 71, is stare decisis for the proposition that in Laguna Madre there is no substantial difference between mean high tide and the line of highest tide in winter. So, under State v. Balli, supra, the shore line of Laguna Madre along the Buena Vista Grant is fixed as a matter of law at the line of mean high tide regardless of whether windblown waters be considered ties or not."

We do not so understand that opinion:

Again appellants contend:

"The Republic of Texas adopted the Common Law in 1840 and the Legislature of the State of Texas relinquished title to the Buena Vista Grant in 1852 after the adoption of the common law in this state. The effect of these two acts was to enlarge the rights of the holders of the Buena Vista Grant by redefining the shore at the point of mean high tide."

We think the foregoing statement is not applicable here and is contra to the rule announced in the Balli case [144 Tex. 195, 190 S.W.2d 99] because it is there stated:

"It is clear from the decisions of this court that the rights of the State and respondents must be determined in the light of the civil law in effect at the time of the grant as it existed in the State of Tamaulipas * * * (and) the law of the seashore *. * * '(is) all that ground is designated as the shore of the sea which is covered with the water of the latter at high tide, during the whole year, whether in winter or in summer.' "

Because we are of the view that the evidence is sufficient to sustain the findings of fact of the trial court, we must likewise sustain each of the conclusions of law found by the trial court, and, in so doing, it is our duty to affirm the judgment of the trial court.

Accordingly, each of appellants' points is overruled and the judgment of the trial court is in all things affirmed.